I. BACKGROUND
A. Trial Evidence[1]
The evidence at trial shows the following: The victim (Melanie Billhartz) and Ted Murgatroyd were good friends. Murgatroyd and appellant were acquainted through mutual friends and because they associated with the "same crowd," primarily at a drug house in El Paso. Appellant was the District Captain of the Aryan Circle gang in El Paso while Murgatroyd was a prospect.
On October 28, 2002, Murgatroyd encountered Billhartz when she pulled up in front of the drug house. Murgatroyd asked Billhartz to take him to a convenience store, and she let him drive, with her as a passenger. On the way back from the store, Murgatroyd made a sarcastic comment, and Billhartz "flipped out" and started hitting him and screaming at him to get out of her truck. Murgatroyd stopped the truck, and as he was attempting to leave the vehicle, Billhartz hit him in the face and jumped on him. As he put his hand up, he struck her on the lip. Billhartz then drove to the house, with Murgatroyd following on foot. When Murgatroyd reached the house, Billhartz was sitting in her truck, parked in front of the house.
Murgatroyd's associates, including appellant, who believed that Murgatroyd had attacked Billhartz, came out to talk to him. While Billhartz remained in the truck, they discussed the situation. The dilemma that this group faced was that Billhartz wanted to call the police and report an assault by Murgatroyd. But when the police were mentioned, Appellant stated his disapproval of this possibility and his intention to kill the victim. However, no other member of the group agreed with the idea of killing Billhartz, and Appellant became upset. Because the other members of the group were opposed, Murgatroyd "assumed it was a dead issue." According to Murgatroyd, Appellant had wanted to kill Billhartz to prevent the discovery of the drug house.
Murgatroyd did not see Appellant again until three to five hours later, when Appellant pulled up to the drug house in Billhartz's truck, with her body in the back of the cab. Chase Hale saw Appellant return with Billhartz's truck, and Appellant told Hale to stay away from it because appellant had just killed Billhartz. Appellant then ordered Murgatroyd to pick up a shovel and machete in order to go bury the victim. After driving to New Mexico, Appellant ordered Murgatroyd to cut off the victim's fingers to prevent any DNA from being found under her fingernails. Appellant then dumped the body in New Mexico, but Murgatroyd was under the impression that he took the victim's fingers with him.
The next day,[2] Appellant told Donald Frank that he had "messed up" and killed someone. He explained that the victim was *651 Billhartz, listed a number of people who knew he had committed the murder, and stated that Murgatroyd had accompanied him when he disposed of the body. Appellant also told Frank that Murgatroyd had cut a couple of Billhartz's fingers off and became "real grossed out" about it. Frank had prior felony convictions, including for dealing drugs.[3]
On November 23, Murgatroyd led the authorities to the victim's body and gave them a written statement about the events he was involved in. That same day, Appellant was apprehended when a Hale County deputy sheriff stopped him in Billhartz's truck. Appellant initially stated that he was buying the truck from his girlfriend. He subsequently denied murdering Billhartz and claimed that he had dropped her off in Juarez, Mexico, and borrowed her truck.
On November 25, Appellant confessed to the offense to Detective David Samaniego of the El Paso Police Department. According to Detective Pantoja of the El Paso Police Department, when he met with Appellant, Appellant was advised of his rights, waived his rights, and never requested the presence of an attorney. Further, Pantoja testified that while appellant mentioned that he was taking medication, he never requested the medication.[4] Pantoja also testified that appellant was coherent during the conversation, seemed to understand what he was saying, and was not emotional or distraught. Likewise, Detective Samaniego testified that Appellant was coherent and stable when he spoke with the detective and when he signed the confession. Samaniego further testified that he did not threaten or coerce Appellant and did not promise him anything.
Among the details contained in Appellant's confession was the fact that Appellant had used an "extension cord" to strangle the victim and that the cord was wrapped around the victim's neck several times. Appellant's confession stated that he got the extension cord from the drug house. The confession also stated that Murgatroyd used a machete to chop off fingers from the victim's right hand. Detective Samaniego had not been aware at the time of Appellant's interview that any of the victim's fingers had been cut off.
An autopsy showed that a black, three pronged power cord was wrapped around the victim's neck three times and tied tightly. Her nasal bones were fractured, and she had multiple fractures of the lower jaw bone, fractures in her right hand, a fractured rib, cutting or sawing in the fingers area of her right hand, and fingers missing from her right hand.
B. Conviction, Appeal, and Habeas
Appellant was convicted of capital murder[5] and sentenced to death[6] in 2005. This Court affirmed his conviction and sentence *652 on direct appeal.[7]
In 2007, attorney Robin Norris timely filed a post-conviction habeas application on Appellant's behalf. In 2008, Appellant advised Norris that he did not wish to pursue further efforts to set aside his conviction and sentence and that he wanted the habeas application to be dismissed. Norris filed a motion to dismiss and a request for a competency evaluation. The habeas court appointed two experts to evaluate Appellant's competency. These two experts determined that Appellant was competent.
In a subsequent letter and at a 2009 habeas hearing, Appellant stated that he no longer wanted to drop his remaining post-conviction remedies. However, expressing dissatisfaction with Norris, Appellant stated that he wished to pursue his remedies on his own. At the hearing, the habeas court conducted an extensive colloquy with Appellant on the dangers of pursuing a habeas application on his own-both because of the potential bar to subsequent applications and because of disadvantages of proceeding without an attorney. Throughout this colloquy, Appellant stated that he understood what he was being told and that he wanted to pursue habeas on his own. And despite repeated warnings from Norris and the habeas court that he might lose his habeas remedy altogether, Appellant maintained that he wanted the habeas application filed by Norris to be dismissed.
The habeas court recommended that the habeas application be dismissed. Deferring to that recommendation, we dismissed the application.[8]
Appellant filed federal habeas proceedings in 2010. The United States district court denied relief and denied a certificate of appealability on all claims.[9] On December 21, 2012, the Fifth Circuit affirmed the denial of the certificate of appealability.[10] The Supreme Court denied certiorari on October 7, 2013.[11]
C. DNA Proceedings at Trial Level
On February 25, 2013, OCFW filed a motion for DNA testing on Appellant's behalf. The motion requested DNA testing of the "ligature" found on the victim's neck. The motion argued that a test for "touch DNA" could show that someone other than Appellant used the ligature to strangle the victim. The motion contended that "[t]here has never been a question about how many people participated in the actual murder of Billhartz (one), or what weapon was used (the cord ligature)." The motion further contended that Appellant's confession "should be viewed in light of his mental state at the time of his confession" and that, because "there were not eyewitnesses to the murder and accounts from witnesses were inconsistent, there is no concrete evidence that [Appellant] committed the murder." The motion also contended that "[a]t a minimum, the DNA test [Appellant] is requesting should show that [Appellant's] DNA is not on the murder weapon" and that "the DNA results can be compared with profiles from other people at" the drug house and can "be run *653 through CODIS, thereby possibly identifying the actual killer."
Appellant signed an affidavit in support of the motion. The affidavit referred to the fact that he had been convicted and alleged that the State had possession of a three-pronged black power cord that had been wrapped around the victim's neck, that the evidence had not been tested, that the evidence was subject to a chain-of-custody rendering DNA testing feasible, and that identity was and is an issue in the case. He also contended that he would not have been prosecuted or convicted if the evidence had been tested before trial and had yielded exculpatory results, and he claimed that he was not making the request for DNA testing to unreasonably delay the execution of sentence or the administration of justice.
In a letter dated October 12, 2013, Appellant asked the trial judge to consider, before setting an execution date, that his attorneys were trying to get relief under Ex parte Medina and to take a look at that case. In Medina , this Court found that the purported habeas application filed by Norris was so deficient that it did not qualify as a habeas application, and consequently, the Court appointed new counsel to file an initial habeas application.[12]
On February 2, 2016, Appellant filed a pro se motion to withdraw the motion for DNA testing and to have an execution date set. On October 3, 2016, Appellant filed a pro se motion to withdraw the motion for DNA testing. In this second pro se motion, he contended that the "chapter 64 motion was filed as a stall tactic in hopes that it would keep this court from issuing an execution date." That same day, he also filed a pro se motion to set an execution date, making the same "stall tactic" allegation. In a letter to the trial judge on October 6, 2016, Appellant referred to the two motions filed a few days earlier and stated, among other things, "I do not like the person I have become, and I need to be put down like the rabid dog that I am. I can't even look at myself in the mirror and face myself."[13] He further stated that "these walls 24/7 have broken me. It is taking every last ounce of will to even make it from day to day." In a letter to the district attorney's office, Appellant referred to the two October 3 motions and stated, among other things, "I have done this [be]cause I believe it[']s time for justice to be served, and to give the victim[']s family closure." In a letter dated December 1, 2016, Appellant told the trial court that he "will not be filing any last minute appeals or motions. If there is anything filed on my behalf after you have issued me an execution date, it will have been done without my permission and should be disregarded."[14] He further stated that the DNA motion "should be denied or withdrawn as it would be a waste of time and money, as my DNA is on the murder weapon and the chapter 64 was only filed as a stall tactic."
On March 27, 2017, a hearing was held on the DNA motion, and Appellant attended by teleconference. An OCFW attorney told the trial court that Appellant had attempted suicide three months earlier. The attorney maintained that Appellant's medical records showed "numerous examples of his psychiatric condition deteriorating, basically, during his time at the Polunsky unit." The attorney stated that if *654 Appellant "attempts to proceed with essentially removing our office so that he can dismiss his Chapter 64 motion, we anticipate asking Your Honor to initiate competency proceedings to determine whether Mr. Hall, in essence, is competent to represent himself during these appeals."
When asked about his thoughts on the DNA motion, Appellant stated, "It's just a waste-its going to be a waste of the Court's time to even pursue it." Appellant subsequently elaborated, "I mean, it's just going to be a waste of the Court's time, you know, because, you know, my DNA is going to be on there. And if it's not, you know, then it's by some miracle. But, you know, that's the murder weapon I used to kill Melanie." With respect to the issue of competency, Appellant stated, "Well, I can guarantee you I'm 100 percent competent." When told that his voice was pretty strong, Appellant replied, "You know, if you're going to send some doctors over here to test me, I can guarantee you they're going to come back with a finding that I'm competent. So that would just be a waste of the Court's time."
The trial court denied the motion for DNA testing. When asked, Appellant affirmed that he did not want to appeal. Nevertheless, OCFW maintained that it wished to appeal on Appellant's behalf because it was in Appellant's best interest.
During the discussion that followed, Appellant stated, "I killed Melanie, and I killed Arturo. And I accept the punishment for it, and I'm ready to get it over with, you know." Appellant further stated, "I feel like I'm-you know, I'm being bullied into either doing what he [OCFW attorney] says or, you know, he is going to file competency on me, you know." Later, Appellant stated, "I apologize to the Court and to them [OCFW], you know, for this stall tactic that I used, you know. But, I mean, hey, they can't be mad at me and want to file competency on me now." The trial court responded that the OCFW attorneys "just want to save your life." Appellant responded, "I understand that, Your Honor, but I'm guilty of this crime. You know, the jury sentenced me to death, and I'm ready for that punishment to be carried out. There's nothing incompetent about, you know, that thinking for me."
Appellant then elaborated further on the issue of competency:
You know, if I would have knew that-he just laid it on me Thursday about this competency. If I would have knew that I had to be in your courtroom to sway any kind of competency issues, with you, you know, I would have went out there. But, you know, it's like he held it off to the last minute, you know, and I'm stuck between a rock and a hard place, you know.
The trial court responded that a competency exam might have to be conducted and "might be of some value." Appellant responded, "Not going to be of any value." The trial court responded that it might be valuable to get a "yes" or "no" on the issue of competency. Appellant responded, "I can guarantee you it is going to be a yes." The trial court stated, "Well, it has been in the past and it may be in the future." Appellant responded, "I don't know what the issue would be now, you know, why we even have to go through competency."
D. Abatement and Remand
On April 20, 2017, OCFW filed a notice of appeal from the denial of the DNA motion. On May 31, 2017, consistent with requests from OCFW, the trial court ordered that Appellant be re-evaluated for competency. This order was over the State's objection. OCFW subsequently filed a motion to abate the appeal for a competency determination and a motion to extend the time to file the appellate brief.
*655 We denied the motion to abate for a competency determination, took no action on the motion for extension, and abated the case on our own motion to elicit the following information from the trial court: what authority the trial court has to have appellant re-evaluated, what facts support such a re-evaluation, and the time frame for the re-evaluation process, if it is otherwise authorized.[15]
In November 2017, Appellant filed an unsworn declaration, under penalty of perjury, which included the following information:
(1) Appellant wished to waive any further appeals and have the sentence of death by execution carried out.
(2) All affidavits previously executed in support of appeals or motions were false and made to "game the system and appeals process."
(3) The Chapter 64 DNA motion was "filed as a stall tactic as another way to game the system."
(4) Appellant was "guilty of murdering Melanie Billhartz and Arturo Diaz" and his confessions to the police "were not coerced in any way."
(5) Appellant "alone made the call to kill Melanie to keep her from reporting about the meth lab."
(6) Appellant does not "suffer from blackouts or any other mental defect."
In August 2018, the trial court filed findings in accordance with our abatement order. The trial court determined that it did not have any authority to order a competency re-evaluation. The trial court also determined that it based its competency re-evaluation order on two facts: (1) the statement by the OCFW attorney that Appellant had attempted suicide, and (2) a Texas Department of Criminal Justice (TDCJ) use of force video showing Appellant acting in a belligerent manner.[16]
II. ANALYSIS
A. It has not been shown by a preponderance of the evidence that Appellant would not have been convicted.
1. Standards
To be entitled to post-conviction DNA testing, a convicted person must satisfy the requirements of Chapter 64 of the Code of Criminal Procedure.[17] One of those requirements is that "the convicted person establishes by a preponderance of the evidence that ... the person would not have been convicted if exculpatory results had been obtained through DNA testing."[18] This means that a convicted person must show a greater than 50% chance that he would not have been convicted if exculpatory results from the requested DNA testing had been available at trial.[19] "Exculpatory results" means only results excluding the convicted person as the donor *656 of the DNA.[20] In considering the likelihood of conviction, we limit our review to whether exculpatory results would alter the landscape of evidence at trial, and we do not consider post-trial factual developments.[21]
OCFW contends that an analysis of the electrical cord for "touch DNA" could yield DNA samples and that the pressure and friction that would occur during strangulation would increase the amount of DNA transferred to a ligature. OCFW also contends that tying the power cord tightly in knots would provide a rough surface that would be more likely to retain and protect skin-cell DNA. OCFW further contends that someone else's touch DNA on the power cord would show that someone else committed the murder. OCFW argues that DNA results implicating a third party can be sufficient to create a greater than 50% likelihood that the jury would not have convicted but acknowledges that other factors could negate such a conclusion.
Whether the DNA of a third party would establish a greater than 50% chance that the defendant would not have been convicted depends on the circumstances of the case.[22] In a given case, the presence of a third party's DNA may not have any tendency to exonerate the defendant from the crime.[23] And even when the presence of a third party's DNA may tend to be exonerating, the convicted person's burden will not be satisfied "if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing."[24] On the other hand, under some circumstances, the presence of DNA from a third party is so strongly exonerating that the convicted person's burden will be met despite the existence of other substantial inculpatory evidence.[25]
*657 The presence of a third party's DNA is so strongly exonerating when it is clear that the biological material in question was left by a lone assailant.[26]
2. "Lone Assailant" Theory Is Inapplicable.
OCFW contends that "[i]n this case there is no issue how many killers there were" and that "[t]he ligature is the one piece of evidence that should contain only the DNA of Ms. Billhartz and the lone murderer." Our prior "lone assailant" cases involved sex offenses,[27] and the records in those cases contained strong evidence that there was a lone assailant regardless of who that assailant was . A typical scenario would be the victim testifying that a single individual sexually assaulted her, evidence showing that semen was deposited inside the victim, the victim testifying that she had not recently had sex with anyone else, and the victim identifying the defendant as her attacker.[28] In that situation, the fact that the victim was sexually assaulted by a single individual does not depend on the accuracy of her identification of that individual. Her identification could be wrong, and a finder of fact would still have every reason to believe that only one assailant was involved. If the semen in that situation does not match the defendant's DNA, then the victim's identification must have been wrong, however credible it might otherwise seem.
Appellant's case is different because the evidence that suggests a lone assailant is evidence that specifically and necessarily inculpates him. It is simply not possible to conclude from this evidence that there was a lone assailant without also concluding that the lone assailant was Appellant. For example, in his confession, Appellant details the circumstances surrounding his killing of the victim. Those circumstances make it clear that Appellant was the sole murderer. But that requires believing the confession, which entails a conclusion that Appellant is guilty. Murgatroyd's testimony that Appellant returned alone with the victim's body also suggests that Appellant was the sole murderer. But it does so only by specifically linking Appellant to the murder. Likewise, the testimony that Appellant was the only member of the drug-house group that wanted to kill the victim suggests a sole murderer only to the extent it links Appellant to the murder. If there is something wrong with all of this inculpatory evidence-if the various witnesses were not being entirely truthful about who did what-then we really do not know how many people were involved in the offense. Perhaps everyone at the drug house conspired to murder Billhartz, or perhaps Murgatroyd did more with Appellant than help dispose of the body.
And if DNA evidence pointed to someone outside the drug-house group, that fact would just suggest that this other person was involved with Appellant in the murder. The existence of an outsider's DNA might indicate that the other drug-house members were ignorant of this outsider's involvement, but all of the evidence connecting Appellant to the murder would still be probative: he expressed an intent to kill the victim, returned with her dead body, and implicated himself in her murder.
Evidence that merely shows that someone other than Appellant was also involved in the crime does not exonerate *658 Appellant.[29] And even if exculpatory DNA results would tend to indicate that Appellant was not the perpetrator, the fact that the evidence is not strongly exonerating means that we would look to see whether inculpatory evidence in the record weighs against a conclusion that Appellant would not have been convicted.[30]
3. Whether DNA Results Would Show Any Assailant is Questionable.
The State argues that DNA on the power cord would not necessarily belong only to Billhartz and the murderer because at least ten individuals "resided or regularly hung out at the drug house" from which the power cord came and, so, may have handled it at some point. The State is correct. DNA analysis is not as probative when the items tested are not at "a place where only a reasonably limited number of ... DNA contributors would be found."[31] Touch DNA poses special problems because "epithelial cells are ubiquitous on handled materials,"[32] because "there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them,"[33] and because "touch DNA analysis cannot determine when an epithelial cell was deposited."[34]
Even assuming that these issues can be mitigated by the circumstances of using a power cord to strangle someone-pressure and friction causing more DNA to be deposited and knots allowing more DNA to be retained, as Appellant argues-the significant possibility of DNA being deposited by an innocent person reduces the probative value of any exculpatory DNA test result.
4. Inculpatory Trial Evidence Precludes Appellant from Meeting His Burden .
In the section of its brief addressing the issue of whether a more than 51% chance has been shown that Appellant would not have been convicted, OCFW devotes a great deal of effort to attacking the credibility of various witnesses who implicated Appellant in the murder. OCFW does not, in this section, address the credibility of Appellant's confession. Appellant's confession to the police that he committed the murder is strong evidence of his guilt.
OCFW does address the confession in a prior section addressing whether identity is in issue. OCFW points out that Appellant initially denied any involvement in the murder, but initial denials of involvement in a crime are common in cases in which the perpetrator ultimately confesses. OCFW claims that Appellant has "continuously maintained his innocence" after providing such a confession, but it supplies no record references to support that proposition. Moreover, it is not unusual for a person who confesses to later plead not *659 guilty and require the State to prove his guilt at trial. OCFW also states that "the fact that [Appellant] provided a confession should be viewed in light of his mental state at the time of his confession." Nowhere in the body of its brief does OCFW claim that the confession was involuntary.
In a footnote in its brief, OCFW contends that, at the time of Appellant's confession, "he had been in custody for over fifty-five hours, suffering from lack of sleep and methampetamine withdrawal, and unable to access medication prescribed for mental health reasons." Other than the time of custody, the three record references given do not substantiate these allegations. Record reference 45TRR98 contains nothing related to these allegations, but page 99 contains an affirmative response by Sergeant Henry Cooper to the question "Now, after reading the statements, he became very upset and he talked about being on medication or wanting to know where his medication was; isn't that correct?" Record reference 67TRR17-19 involves testimony from Aimme Quintela, Appellant's female traveling companion when he was stopped in the victim's truck. This testimony indicated that Appellant had stopped using crystal meth the day they left Carlsbad, New Mexico to travel to Lubbock, that Appellant became very tired and pulled over the car to sleep, that a police officer approached and asked for license and registration, and that Appellant's responses did not make sense to Quintela. Record reference 68TRR50 involves argument by defense counsel claiming that Appellant had gone "days, perhaps weeks, without sleeping." OCFW points to nothing in the record to support counsel's assertion, and in any event, points to nothing to suggest that any lack of sleep caused Appellant's confession to be involuntary.
Moreover, the State presented evidence supporting the conclusion that Appellant's confession was voluntary. Police detectives testified that Appellant appeared to be coherent and to understand what he was saying and that Appellant was not emotional or distraught. One police detective also testified that, while Appellant mentioned that he was taking medication, he never requested the medication. There was also testimony that Appellant was advised of his rights and waived them and that the officers made no threats or promises.
In addition, Appellant's statement contained details that matched what the police discovered when the body was found: the power cord being wrapped several times around the victim's neck and fingers having been cut off from her right hand. Especially significant was the fact that the detail about the fingers being cut off was not known to the police interrogator at the time Appellant confessed.
Moreover, the day after the murder, weeks before he confessed to the police, Appellant admitted committing the murder to Donald Frank.[35] This admission to Frank included the detail about the victim's fingers being cut off. OCFW makes no effort in its brief to challenge Frank's credibility.
Consequently, even if another person's DNA were found on the power cord, the evidence at trial would still strongly implicate Appellant in the victim's murder. Appellant's confessions to both law enforcement and to Frank tie him to the murder. His knowledge of details matching the victim's body show that he would have at least been involved in the body's disposition, and the effective communication of these details to the police and to Frank supports the other evidence that Appellant *660 was of sound mind at the times he confessed and that the confessions were in fact true. Accordingly, we conclude that OCFW has failed to show a greater than 50% chance that the jury would have found Appellant not guilty if presented with DNA from another person on the power cord.
B. It has not been shown by a preponderance of the evidence that the request for testing was not made to unreasonably delay the execution of Appellant's sentence.
Whether the burden has been met to show that the request for testing has not been made to unreasonably delay the execution of sentence is an "inherently fact-specific and subjective inquiry."[36] Circumstances to be considered include "the promptness of the request, the temporal proximity between the request and the sentence's execution, or the ability to request testing earlier."[37] But these circumstances are not exclusive, and the cases enumerating them turned on "discrete facts" and "offer no definitive criteria" resolving this inquiry.[38]
OCFW states that the Fifth Circuit denied relief to him on federal habeas shortly before he filed his motion for DNA testing and that his federal habeas case was still pending before the Supreme Court at the time he filed his current motion. He states that he does not have an execution date pending. He contends these factors show that his current motion for DNA testing was not made to unreasonably delay his execution date. We disagree.
OCFW acknowledges that "touch DNA" testing has been around since the early 2000s. Despite that fact, Appellant's attorneys did not ask for such testing at Appellant's trial. Even if we credit OCFW's contention that crucial technology for such testing was developed in 2007[39] and that this type of testing was not well-publicized until 2008,[40] that leaves about five or six years before Appellant requested testing in 2013. The post-conviction DNA testing statute has been around since 2001,[41] and Appellant's direct appeal was decided in 2007.[42] It is true that Appellant's federal habeas case extended into 2013, if one counts the Fifth Circuit and U.S. Supreme Court's decisions to deny review. But while a pending federal habeas writ can be an impediment to filing subsequent state habeas proceedings,[43] it is no impediment to filing a motion for DNA testing. Consequently, the pendency of federal habeas proceedings is not a good excuse for failing to file a motion for DNA testing. The fact that Appellant waited until his federal habeas remedy had nearly run its course-two months after the Fifth Circuit had denied his federal appeal-suggests that Appellant was in fact attempting to use the DNA motion to further delay any execution date.
Moreover, in both pro se motions and in his testimony at the DNA hearing, Appellant *661 stated that he was the murderer and that the motion for DNA testing was a "stall tactic." Appellant's testimony at the hearing was coherent. This testimony would clinch the conclusion that the DNA motion was for the purpose of unreasonably delaying Appellant's execution unless a lack of competency on Appellant's part precludes us from crediting the testimony.
OCFW counsel suggested that Appellant was incompetent to decide whether to waive his DNA motion or the appeal of that motion. Assuming, without deciding, that lack of competency to waive death-penalty remedies would be sufficient to preclude us from crediting Appellant's statements regarding the purpose in filing the DNA motion, we reject OCFW's claim. Appellant was determined to be competent to waive post-conviction remedies when he first sought to do so in 2008. In the somewhat similar context of competency to stand trial, we have held that the issue of competency need not be revisited after a prior determination of competency "absent a material change of circumstances suggesting that the defendant's mental status has deteriorated."[44]
The trial court based its decision to order a competency hearing on OCFW's representation that Appellant had attempted suicide and on a TDCJ video showing Appellant acting in a belligerent manner. Neither of these factors shows a material change in circumstances sufficient to justify a competency inquiry. We have indicated in the competency-to-stand-trial context that a suicide attempt does not necessarily indicate a lack of competency.[45] A suicide attempt would seem even less likely to indicate a lack of competency with respect to waiving death-penalty remedies because a person who rationally agrees to stop fighting execution is agreeing to have his life ended. Further, before his suicide attempt, Appellant repeatedly sought not only to waive further remedies but also to have an execution date set (making requests on February 2 and October 3, 2016), and those requests were declined. Under the circumstances, this is not evidence of incompetence.
In his October 6 communication with the trial court, Appellant did say that he had been "broken" by his 24/7 confinement on death row. This statement does not necessarily indicate any lack of competency on Appellant's part. Being depressed by his circumstances is understandable and is a rational response to adverse conditions.[46] At the hearing months later, Appellant stated that he accepted the punishment and was ready to get it over with. He told the trial court that he was 100 percent competent and that another competency evaluation would be a waste of time. In light of this testimony, Appellant's earlier statement about being "broken" does not, even in combination with his suicide attempt, indicate a lack of competency.
As for belligerent behavior, such behavior by prison inmates is, unfortunately, a common occurrence. It could be fueled by depression arising from the circumstances of incarceration. It does not necessarily indicate a lack of competency, even when combined with the depression and attempted suicide.
*662 Having determined that the two factors relied upon by the trial court do not show a sufficient change in circumstances so as to justify a reconsideration of competency, we conclude that a reconsideration of the 2008 determination of competency is unwarranted. Because we do not reconsider Appellant's competency, we credit his statement that the DNA motion is a stall tactic. Also supporting that conclusion is the five or six year delay filing the DNA motion. We conclude that it has not been shown by a preponderance of the evidence that Appellant's DNA motion was not made to unreasonably delay the execution of his sentence.
III. DISPOSITION
We conclude that OCFW has not shown by a preponderance of the evidence that (1) Appellant would not have been convicted if exculpatory results had been obtained in the testing that is now being requested, or (2) that the request for such testing was not made to unreasonably delay the execution of Appellant's sentence. A failure on either showing would be sufficient to deny relief. Consequently, we uphold the trial court's decision to deny testing.
Yeary, J., concurred.

Some of the trial background facts are recited in the direct appeal opinion in this case, but we have added more in present opinion. See Hall v. State , No. AP-75, 121, 2007 WL 1847314, 2007 Tex. Crim. App. LEXIS 1857 (Tex. Crim. App. June 27, 2007) (not designated for publication).

The State prefaced its questioning by asking Frank "to go back to October 28, 2002." Frank testified that the conversation occurred in the morning, but the murder occurred on the evening of October 28, so a rational jury could believe that Frank was relating events occurring on the following day.

OCFW's brief claims that Hale, Murgatroyd, Tim Davis, Jesse Eddy, and James Eaton all had self-serving reasons for implicating Appellant but does not make such a claim with respect to Frank.

Appellant himself testified that he did not take his prescribed medications because he was "paranoid of the deputies" that were assigned to his jail. In a footnote, OCFW makes allegations about Appellant's mental state at the time of his interrogation. We conclude that these allegations are largely unsupported by the record and will address them in detail in the analysis section of this opinion.

See Tex. Penal Code § 19.03(a)(2) ("the person intentionally commits the murder in the course of committing or attempting to commit ... obstruction or retaliation").

See Tex. Code Crim. Proc. art. 37.071.

See supra at n. 1.

Ex parte Hall , No. WR-70,834-01, 2009 WL 1617087, 2009 Tex. Crim. App. Unpub. LEXIS 398 (Tex. Crim. App. June 10, 2009) (not designated for publication).

Hall v. Thaler , No. EP-10-CV-135-FM, 2011 WL 13185739, 2011 U.S. Dist. LEXIS 165079 (W.D. Tex. December 20, 2011) (not designated for publication).

Hall v. Thaler , 504 Fed. Appx. 269 (5th Cir. 2012) (not designated for publication).

Hall v. Stephens , 571 U.S. 818, 134 S.Ct. 385, 187 L.Ed.2d 28 (2013).

361 S.W.3d 633 (Tex. Crim. App. 2011).

Most of Appellant's pro se motions and correspondence are handwritten with some letters of the alphabet being consistently capitalized. Capitalization is converted to lowercase where appropriate without notation.

Emphasis in original.

Hall v. State , No. AP-77,072, 2017 WL 4162119, 2017 Tex. Crim. App. Unpub. LEXIS 759 (Tex. Crim. App. September 20, 2017) (not designated for publication).

By the time the trial court issued its findings, a competency evaluation by two court-appointed experts had been completed. According to the trial court's findings, those experts concluded: "(A) the appellant is not suffering from a mental disease or defect, (B) the appellant is not suffering a mental disease or defect that prevents him from understanding his legal positions and the options available to him, and (C) the appellant is not suffering from a mental disease or defect that prevents him from making a rational choice among his options."

See Tex. Code Crim. Proc. art. 64.03.

Id. art. 64.03(a)(2)(A).

Reed v. State, 541 S.W.3d 759, 774 (Tex. Crim. App. 2017).

Id.

Id.

See Routier v. State , 273 S.W.3d 241, 257 (Tex. Crim. App. 2008) (concluding that exculpatory results of DNA testing of certain items "by themselves, do not prove much" but when combined with other circumstances of the case "have a strong tendency to engender a reasonable doubt in an average juror's mind").

See Prible v. State , 245 S.W.3d 466, 470 (Tex. Crim. App. 2008) ("Evidence of a another person's DNA in addition to Appellant's is not exculpatory evidence in this case due to the additional evidence presented at the trial. Thus, even if the evidence was retested and determined to contain another person's DNA in addition to Appellant's DNA, it would not establish by preponderance of the evidence that Appellant would not have been convicted if the jury had heard that DNA from a third-party was present.").

Swearingen v. State , 303 S.W.3d 728, 736 (Tex. Crim. App. 2010). See also Whitaker v. State , 160 S.W.3d 5, 9 (Tex. Crim. App. 2004) ("Regardless of whose blood is on the rifle, other evidence at trial established Whitaker's guilt, including his statement that he had killed the victim."); Rivera v. State , 89 S.W.3d 55, 60 (Tex. Crim. App. 2002) ( [A]t best, a negative result from the rape kit could have a bearing on whether appellant and Zavala had sexual intercourse, but it would not indicate innocence of the capital murder of the child. Even if one concluded that negative test results supplied a very weak exculpatory inference, such an inference would not come close to outweighing appellant's confession. Not only did appellant admit to sexually assaulting and murdering the child, but his sexual assault admissions were also corroborated by autopsy results showing injury to the victim's anus. And although appellant claims that his confession was involuntary because it was beaten out of him, the trial court found against him on that claim at trial, and he failed to raise such a claim on direct appeal or in his application for writ of habeas corpus.").

Esparza v. State , 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) ("In sexual assault cases like this, any overwhelming eye-witness identification and strong circumstantial evidence ... supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence.").

Id.

See ids="12381357" index="21" url="https://cite.case.law/sw3d/518/439/#p449">id. ; Blacklock v. State , 235 S.W.3d 231, 232-33 (Tex. Crim. App. 2007) ; Smith v. State , 165 S.W.3d 361, 364-65 (Tex. Crim. App. 2005).

See supra previous footnote.

LaRue v. State , 518 S.W.3d 439, 449 (Tex. Crim. App. 2017).

See ids="12381357" index="25" url="https://cite.case.law/sw3d/518/439/#p449">id. ("We agree with Appellant that the court of appeals failed to acknowledge and consider that if re-testing of Augustine's shirt revealed the presence of Pentecost's blood it would enhance the credibility of Appellant's testimony and one of Appellant's prior versions of events. But his DNA found under Pentecost's fingernails-which he does not contest-connects Appellant to this crime with 'unparalleled accuracy.' ").

Reed , 541 S.W.3d at 776-77.

Id.case-ids="12655918" index="27" url="https://cite.case.law/sw3d/541/759/#p774"> at 777.

Id. ("Just as a person may deposit his own epithelial cells, he may deposit another's if those cells were exchanged to him by touching an item another has touched.").

Id.

See supra at Part I.A. & nn. 2, 3.

Reed , 541 S.W.3d at 778.

Id.

Id.

OCFW states that the introduction of the MiniFiler Kit in 2007 increased the ability to obtain DNA results from compromised or smaller samples.

OCFW cites to the JonBenet Ramsey case as causing this method of testing to gain widespread publicity.

See Acts 2001, 77th Leg., ch. 2, § 2.

See supra at n. 1.

See Ex parte Soffar , 143 S.W.3d 804 (Tex. Crim. App. 2004) (requiring a stay of federal habeas proceedings before considering a subsequent state habeas application).

Turner v. State , 422 S.W.3d 676, 693 (Tex. Crim. App. 2013).

Ex parte Lahood , 401 S.W.3d 45, 56 (Tex. Crim. App. 2013).

See Bundy v. Dugger , 675 F.Supp. 622, 625 (M.D. Fla. 1987) (Expert testified that the absence of situational depression and agitation would be surprising given the grave consequences the defendant was facing and that periods of situational anger, stress, and depression would be normal reactions under the circumstances.).