

# NUMBER 13-23-00121-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**CORINA LAM LOPEZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

## ON APPEAL FROM THE 105TH DISTRICT COURT
## OF KLEBERG COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Silva**
**Memorandum Opinion by Justice Benavides**

In 2012, appellant Corina Lam Lopez was convicted of capital murder, and this Court affirmed her conviction the following year. *Lopez v. State*, No. 13-12-00230-CR, 2013 WL 6211457 (Tex. App.—Corpus Christi–Edinburg Nov. 26, 2013, pet. ref'd) (mem. op., not designated for publication). This appeal concerns the denial of her motion for

post-conviction DNA testing. *See* TEX. CODE CRIM. PROC. ANN. art. 64.01 ("Chapter 64").

By a single issue, Lopez contends that she is entitled to relief under Chapter 64. We affirm.

## I. BACKGROUND

In the early morning hours of December 7, 2005, someone broke into Susan Rousseau's home and bludgeoned her to death with a wooden baseball bat.

### A. Investigation

In addition to signs of a forced entry, police discovered that the phone line to Rousseau's home had been severed. Their attention quickly turned to Lopez. In the months leading up to the murder, Lopez had sent Rousseau two threatening letters, and a witness observed Lopez drive by Rousseau's trailer home on several occasions during that period. The source of contention was Rousseau's new boyfriend, Oscar Peña, whom Lopez had previously dated for approximately ten years. In one of the letters, Lopez told Rousseau to stop seeing Peña, and if Rousseau complied, she would be "left alone." Out of concern for her safety, Rousseau relocated her trailer within the park and asked the manager of the park to "keep an eye on her RV."

In an initial interview with police, Lopez denied being anywhere near the trailer park on the night of the murder. She consented to a search of her vehicle, cell phone, and apartment. The search of the cell phone revealed that, on the night of the murder, beginning at 11:35 p.m. and ending at 1:45 a.m., several calls were made between Lopez and someone listed in her phone as "George." Lopez told police that "George" was merely someone interested in buying Peña's Chevrolet Camaro and that he had left town with

2

her daughter Amanda before the murder.

During the search of her apartment, police found a Wal-Mart receipt with a timestamp of 11:59 p.m. from December 6, 2005. The police reviewed surveillance video from the Wal-Mart that night and observed someone they identified as Lopez wearing a black hooded sweatshirt inside the store with an unidentified male. Lopez had previously told police that she had gone to Wal-Mart alone that night.

Over the course of the next two months, an anonymous female called the local Crimestoppers line several times and identified "Ricky Segura" as the perpetrator, saying in the first call, made only one day after the murder, that Segura beat Rousseau with a baseball bat. Virginia Rowley fielded each of these calls, and when police asked her to compare the voice of the caller to a tape recording of Lopez's voice, Rowley said the two voices were similar. When the anonymous tipster called a sixth time, police instructed Rowley to keep the caller on the phone while they drove by known pay phones in the area. The police found Lopez at a payphone and Rowley on the other end of the line. Police were never able to locate anyone in the area named "Ricky Segura."

Police eventually obtained a copy of Lopez's cell phone records, and the same number listed as "George" on her cell phone was registered to George Garza. Police compared a known photo of Garza to the surveillance video from Wal-Mart, and according to one detective who testified at trial, there were similarities between the two subjects. The case went cold for several years until, during a videotaped interview with police, Garza confessed to murdering Rousseau. He said that Lopez offered him a ride on the night of the murder but conditioned the ride on him burglarizing Rousseau's trailer—an

arrangement Garza agreed to. He later made a written statement to the same effect.

Based on this new evidence, Lopez was arrested and indicted for capital murder. During a subsequent interview with police, Lopez admitted to going to Wal-Mart with Garza that night and later driving him to Rousseau's trailer park. However, Lopez maintained that she drove Garza to the trailer park to look for Peña because Garza, who was her daughter's friend, called her "constantly" on the night of Rousseau's murder to inquire about buying Peña's Camaro. Lopez acknowledged that she knew Rousseau had moved her trailer to a new location. Lopez also admitted that she knew Peña was at work that night but said they went to look for him at the trailer park anyway. Lopez said that having not found Peña, she dropped Garza off at a Love's Truck Stop. After dropping Garza off, Lopez acknowledged that she drove by Rousseau's trailer a second time to again look for Peña.

When asked why she did not mention Garza during her initial interview with police several years before, Garza said she was "afraid" to tell them about Garza because her car "smelled like alcohol." Lopez described Garza as "all messed up" and "coked up" on the night of Rousseau's murder, adding that Garza "gets scary when he's like that." Toward the end of the interview, Lopez admitted that Garza had told her that he and a friend of his were "going to get stuff" at the trailer park, but he did not specify what or where. Finally, Lopez admitted that she had wished Rousseau was dead.

**B.    Trial**

Lopez was tried first. The State offered Garza testimonial immunity, but when he was called as a witness, Garza invoked his Fifth Amendment Right against self-

4

incrimination. His prior confessions inculpating Lopez were not admitted into evidence. The State focused instead on the circumstantial evidence connecting Lopez to the murder.

The State also put on scientific evidence. Although this evidence was not particularly useful to the State, the prosecutor explained to the jury during closing arguments that this evidence was presented to show that police had done a thorough investigation. Lisa Harmon Baylor, a forensic scientist with the Texas Department of Public Safety (DPS), testified that she examined approximately twenty items collected by the police for possible DNA analysis. As pertinent here, she collected two samples from the baseball bat believed to be the murder weapon. Sample A was consistent with Rousseau's DNA profile, and sample B, taken from the handle of the bat, contained an "interpretable DNA profile." Baylor also tested a swab taken from Rousseau's fingernails. According to Baylor, "the DNA profile obtained from that was consistent with a mixture," and Rousseau could not "be excluded as a contributor to that sample." Baylor also examined a black hooded sweatshirt seized from Lopez's home. This sweatshirt matched the sweatshirt worn by the female believed to be Lopez in the Wal-Mart security footage. Baylor did not detect any blood stains on the sweatshirt for testing, "but trace tapings were collected and packaged back with the evidence." Baylor explained that a "trace taping" means the collection of "any transfer of possible hair, fibers, anything that would be trace evidence that you could link back to an individual." Baylor also tested a small, "red-colored stain" on a gray t-shirt collected from Lopez's home. The result was negative for biological material. Baylor summarized her findings by agreeing that she did not find

Lopez's DNA on any of the items collected at the crime scene, nor did she find Rousseau's DNA on any of the items collected from Lopez's place.

Another forensic scientist with DPS, Sandy Parent, testified that she microscopically compared hairs recovered from the crime scene (found in Rousseau's left hand) and various items of Lopez's clothing (gray t-shirt, hair scrunchie, jogging pants, black hooded sweatshirt, and a pair of socks) with known samples from the heads of both individuals. Parent explained that this type of comparison has limitations; she can determine whether two samples share similar characteristics, but she cannot say with certainty that similar samples came from the same person. In such a case, "all we can say is that it could have come from that individual or any other individual that may have the same type of characteristics." Parent determined that the hairs recovered from Rousseau's hand were not similar to Lopez's hair and may have come from Rousseau herself. As far as the samples taken from Lopez's clothing, Parent did not find any head hairs for comparison.

The jury was instructed on both an intent-to-promote-or-assist theory of party liability and a conspiracy theory of party liability. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2) (providing that a person is criminally responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense"), 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was

6

committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."). The jury returned a guilty verdict, and Lopez was sentenced to life in prison.

## C. Direct Appeal

In affirming Lopez's conviction, we held that, under a hypothetically correct jury charge, the evidence was sufficient to support her conviction under either theory of party liability. *Lopez*, 2013 WL 6211457, at *11–13.

## D. Chapter 64 Motion

In 2020, Lopez filed her initial motion seeking to test the strands of hair found in Rousseau's hand and the black hooded sweatshirt seized from Lopez's home. Lopez also sought to re-test sample B from the baseball bat using new forensic techniques and to have the unidentified DNA profile detected from Rousseau's fingernail scrapings compared against the DNA profile of Lopez's daughter Amanda. Lopez later supplemented her motion asking for additional items to be tested: three items of clothing worn by Rousseau at the time of the murder, the cut telephone wire near Rousseau's trailer, a piece of foam found inside Rousseau's trailer, and a blue shirt that was found propping open the door to Rousseau's home. The thrust of Lopez's motion was that Amanda committed the murder with Garza; therefore, Amanda's DNA profile would be on the black hooded sweatshirt worn by the female in the Wal-Mart security footage, and Amanda's DNA profile was the unidentified DNA profile found in the scrapings from Rousseau's fingernails. In support of the motion, Lopez submitted the affidavit of a forensic expert who explained the advancements in forensic DNA testing since the items

7

were originally tested and how testing those items now could yield probative results. The expert testified similarly at the hearing. For example, she testified that the black hooded sweatshirt may contain skin cells that were transferred by the person wearing it on the night of the murder. The trial court denied the motion, and this appeal ensued.

## II.    STANDARD OF REVIEW & APPLICABLE LAW

We review a trial court's decision to deny a motion for post-conviction DNA testing under a bifurcated standard of review. *Reed v. State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017). Under this standard, we afford almost total deference to a trial court's determination of issues of historical fact and its application of the law to fact issues that turn on determinations of witness credibility and demeanor, but we review de novo the trial court's application of the law to fact issues that do not turn on determinations of witness credibility and demeanor. *Id.* at 768–69. Accordingly, when the trial court relies exclusively on the trial record and affidavits submitted by the parties, the trial court is in no better position than we are to make its decision, and we review the denial of the motion de novo. *See Smith v. State*, 165 S.W.3d 361, 363 (Tex. Crim. App. 2005). "If the trial court's decision is correct under any theory of law applicable to the case, we will sustain it." *Evans v. State*, 628 S.W.3d 358, 362–63 (Tex. App.—Fort Worth 2021, no pet.) (citing *State v. Ross*, 32 S.W.3d 853, 855–56 (Tex. Crim. App. 2000)); *see also Scott v. State*, No. 14-08-01060-CR, 2010 WL 1236320, at *1 n.2 (Tex. App.—Houston [14th Dist.] Apr. 1, 2010, pet. ref'd) (mem. op., not designated for publication).

To be entitled to post-conviction DNA testing, a convicted person must satisfy the requirements of Chapter 64. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03. As a threshold

8

matter, the convicted person must first establish that the evidence sought to be tested "still exists and is in a condition making DNA testing possible." *Id.* art. 64.03(a)(1)(A)(i). The trial court must also be satisfied that the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." *Id.* art. 64.03(a)(1)(A)(ii). Additionally, there must be "a reasonable likelihood that the evidence contains biological material suitable for DNA testing." *Id.* art. 64.03(a)(1)(B). This includes items in the State's possession that contain "blood, semen, hair, saliva, skin tissue or cells, fingernail scrapings, bone, bodily fluids, or other identifiable biological evidence that may be suitable for forensic DNA testing." *Id.* art. 64.01(a)(1). Chapter 64 relief is only available if "identity was or is an issue in the case." *Id.* art. 64.03(a)(1)(C).

Once these elements have been satisfied, the convicted person must then establish by a preponderance of the evidence that she would not have been convicted if exculpatory results had been obtained through DNA testing. *Id.* art. 64.03(a)(2)(A). "This means that a convicted person must show a greater than 50% chance that he would not have been convicted if exculpatory results from the requested DNA testing had been available at trial." *Hall v. State*, 569 S.W.3d 646, 655 (Tex. Crim. App. 2019) (citing *Reed*, 541 S.W.3d at 774). Generally, an exculpatory result is one that excludes the convicted person as the donor of the DNA. *Id.* at 655–56 (citing *Reed*, 541 S.W.3d at 774). For purposes of our review, we assume that the results would be favorable to the appellant. *Reed*, 541 S.W.3d at 774.

"In considering the likelihood of conviction, we limit our review to whether

exculpatory results would alter the landscape of evidence at trial, and we do not consider post-trial factual developments." *Hall*, 569 S.W.3d at 656 (citing *Reed*, 541 S.W.3d at 774). Exculpatory results that merely "muddy the [evidentiary] waters" are not sufficient. *Ex parte Gutierrez*, 337 S.W.3d 883, 892 (Tex. Crim. App. 2011) (quoting *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002)). "Whether the DNA of a third party would establish a greater than 50% chance that the defendant would not have been convicted depends on the circumstances of the case." *Hall*, 569 S.W.3d at 656. In some cases, "the presence of a third party's DNA may not have any tendency to exonerate the defendant from the crime." *Id.* "On the other hand, under some circumstances, the presence of DNA from a third party is so strongly exonerating that the convicted person's burden will be met despite the existence of other substantial inculpatory evidence." *Id.* For example, the presence of a third party's DNA will overcome substantial inculpatory evidence "when it is clear that the biological material in question was left by a lone assailant." *Id.* at 657; *see, e.g.*, *Esparza v. State*, 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) ("In sexual assault cases like this [one with a lone assailant], any overwhelming eye-witness identification and strong circumstantial evidence . . . supporting guilt is inconsequential when assessing whether a convicted person has sufficiently alleged that exculpatory DNA evidence would prove his innocence under Article 64.03(a)(2)(A).").

### III.    THE RECORD

As a preliminary matter, the parties disagree about which portions of the appellate record are properly before us. The record in this appeal is extensive. It includes each transcript from Lopez's and Garza's separate trials, as well as certain exhibits admitted

at each trial. Lopez contends that we should not consider the record from Garza's trial because his trial occurred after hers and included evidence that was not admitted at her trial; namely, Garza's confessions implicating Lopez. According to Lopez, Garza's confessions were post-trial factual developments because they were not part of "the mix of evidence that was available at the time of [her] trial." *See Holberg v. State*, 425 S.W.3d 282, 285 (Tex. Crim. App. 2014).

The State responds that Lopez waived any complaint about the contents of the appellate record. Alternatively, the State argues that Garza's confessions cannot be post-trial factual developments because they occurred *before* Lopez's trial. According to the State, the fact that Garza's confessions were neither admitted nor admissible at Lopez's trial[1] did not preclude the trial court (or us) from considering them in deciding Lopez's entitlement to relief under Chapter 64. *See Ex parte Gutierrez*, 337 S.W.3d at 893–94 (holding that written statements by appellant's accomplices made prior to appellant's trial were properly before the trial court and explaining that "the constitution does not bar a judge from considering statements that were (or should have been) inadmissible at trial" because a proceeding under Chapter 64 "is an independent, collateral inquiry into the validity of the conviction, in which exclusionary rules have no place, and there are no constitutional considerations"). We agree with the State that Lopez has waived any objection about the contents of the appellate record.

---

[1] Garza's confessions were not admissible because Garza refused to testify at Lopez's trial, and admitting his confessions would have violated Lopez's right to confront her accuser. *See Hale v. State*, 139 S.W.3d 418, 421–22 (Tex. App.—Fort Worth 2004, no pet.) ("The admission of a testimonial statement by an accomplice or codefendant as evidence of guilt of the defendant on trial, absent opportunity by the defendant to cross examine the declarant, is 'sufficient to make out a violation of the Sixth Amendment.'" (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004))).

In back-and-forth filings leading up to the hearing, the parties disputed whether evidence presented at Garza's trial was relevant to Lopez's motion. The State had attached portions of the trial transcript from Garza's trial and asked the trial court to take judicial notice of his entire trial record, including Garza's videotaped and written confessions implicating Lopez in the murder. Through successive filings, Lopez argued, as she does on appeal, that any evidence admitted at Garza's trial that was not admitted at her trial, including Garza's confessions, should not be considered because Garza's trial occurred several months after hers.

At the beginning of the hearing on Lopez's motion, however, the State asked the trial court "to take judicial notice of the contents of both George Garza and Corina Lam Lopez's trial files and appellate files," as well as the attachments to the State's responsive filings, which included portions of the trial transcript from Garza's trial. When the trial court affirmed that it would "take judicial notice" of those items, Lopez's counsel responded, "[W]e have no objection to judicial notice of everything that the State's offered." At no point in the hearing did Lopez reiterate her prior position that it would be inappropriate for the trial court to consider the record from Garza's trial.

To preserve a complaint for appellate review, a party must make a timely request, objection, or motion with sufficient specificity to apprise the trial court of the complaint. TEX. R. APP. P. 33.1(a). Courts have likened Chapter 64 proceedings to habeas corpus proceedings. *Thompson v. State*, 123 S.W.3d 781, 784 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (citing *Cravin v. State*, 95 S.W.3d 506, 509–10 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd)). In a habeas proceeding, "[t]he usual method for making a

12

document from an earlier case part of the record of the current case is to introduce the document and have it admitted into evidence." *Kaman v. State*, 923 S.W.2d 129, 131 (Tex. App.—Houston [1st] 1996, no pet.). "An alternate method to include a document from an earlier case in the record is to request the trial court to take judicial notice of the document." *Id.* (citing TEX. R. EVID. 201). Therefore, when the State asked the trial court to take judicial notice of Garza's entire trial record, including his confessions, it was incumbent upon Lopez to object and obtain a ruling.[2] *See* TEX. R. APP. P. 33.1(a); *Arevalo v. State*, 675 S.W.3d 833, 845 (Tex. App.—Eastland 2023, no pet.) (explaining that "absent the trial court granting Appellant a specific running objection, Appellant was required to timely and properly object to the admission of the evidence each time it was offered at trial in order to preserve his arguments and complaints for appellate review"). Instead, her counsel said he had "no objection." As such, Lopez cannot now complain on appeal that we should not consider the record from Garza's trial. *See* TEX. R. APP. P. 33.1(a); *see also Collier v. State*, No. 14-03-00498-CR, 2004 WL 582888, at *2 (Tex. App.—Houston [14th Dist.] Mar. 25, 2004, pet. ref'd) (mem. op., not designated for publication) (holding that, by failing to raise a timely objection, appellant waived complaint about affidavits attached to State's opposition to motion for DNA testing); *Johnson v. State*, No. 14-02-00663-CR, 2003 WL 1988593, at *1 (Tex. App.—Houston [14th Dist.] May 1, 2003, no pet.) (not designated for publication) (holding that appellant waived complaint about the propriety of affidavits offered by the State during a Chapter 64 hearing

---

[2] We think the better practice is to attach the relevant portions of the record to a filing or offer them as evidence during the hearing.

13

because appellant's counsel stated that he had "no objection" when they were offered). Regardless, as we explain below, the inclusion of Garza's confessions is not outcome determinative in this appeal.

## IV. ANALYSIS

On appeal, the State does not contest that the evidence identified by Lopez is available, contains biological material, and is suitable for testing. Rather, the parties dispute whether Lopez satisfied her burden to establish by a preponderance of the evidence that she would not have been convicted if exculpatory results had been obtained. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A). Echoing her arguments in the trial court, Lopez maintains that the evidence against her was "thin" and circumstantial. She contends that the items to be tested will place Amanda with Garza at the crime scene, and in doing so, cast sufficient doubt on her own guilt.

Lopez also contends that the sweatshirt worn by the woman depicted in the Wal-Mart security footage will contain Amanda's DNA, thereby proving that Amanda, not Lopez, was with Garza shortly before the murder. Despite her admission that she was at the Wal-Mart with Garza on the night of the murder, Lopez contends that the woman in the security video is actually her daughter. As proof, she asserts that the woman in the video looks much younger than Lopez, who was forty-three years old at the time. Along with other exhibits attached to her motion, Lopez provided stills from the video and a mug shot of Lopez taken on December 16, 2005, for comparison.

But as she acknowledges in her brief, "no one thought that Lopez actually beat Rousseau to death." Indeed, that was not the State's theory of the case. Rather, the State

14

argued, among other theories, that Lopez was criminally responsible for Rousseau's murder under the law of parties because she directed and assisted Garza in burgling Rousseau's home. In confirming her conviction, we held that the evidence was legally sufficient to prove that Lopez conspired with Garza to burgle Rousseau's trailer; during the commission of the burglary, Garza murdered Rousseau in furtherance of the conspiracy; and the murder should have been anticipated by Lopez under the circumstances. *Lopez*, 2013 WL 6211457, at \*12–13. In particular, we noted that the evidence established the following facts: Rousseau was murdered during the commission of a burglary at her home; Lopez had threatened and harassed Rousseau in the months leading up to the murder; Lopez knew that Rousseau had moved her trailer to a new location within the park; Lopez initially told police that she did not see Garza or go to the trailer park on the night of the murder; Lopez later admitted to police that she drove Garza to the trailer park that night; Lopez's explanation for why she was at the trailer park with Garza in the middle of the night was far-fetched and contradictory to other statements she previously made; Lopez admitted that Garza told her that he was "going to get stuff" at the trailer park that night; and Lopez intentionally misled the police by anonymously calling Crimestoppers several times and identifying a fictitious person as the perpetrator. *Id.* at \*11. Contrary to Lopez's suggestion, this evidence of what occurred "before, during, and after the commission of the offense" was strong circumstantial evidence of her guilt as a party to the offense. *See Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (quoting *Wygal v. State*, 555 S.W.2d 465, 468–69 (Tex. Crim. App. 1977)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) ("Circumstantial evidence is as

15

probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."); *Hall*, 569 S.W.3d at 656 (noting that "even when the presence of a third party's DNA may tend to be exonerating, the convicted person's burden will not be satisfied 'if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing'" (quoting *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010))).

More importantly, even if Lopez is correct and some of the evidence to be tested places her daughter at the crime scene with Garza, that fact alone would not undermine Lopez's role in the murder as a conspirator. As Lopez acknowledges in her brief, there was no evidence presented at trial that placed her inside Rousseau's trailer; instead, the State argued, among other theories, that Lopez conspired with Garza to burglarize Rousseau's home by suggesting the idea and driving Garza to the location. *See Ex parte Gutierrez*, 337 S.W.3d at 900 (concluding that exculpatory results from evidence taken at the crime scene "would not make it less probable that appellant 'planned the ripoff' and was a party to Mrs. Harrison's murder"). Likewise, the presence of Amanda's DNA on the sweatshirt found at Lopez's home would not be exculpatory because Amanda could have worn the sweatshirt before or after the night in question. *See Hall*, 569 S.W.3d at 658 ("Touch DNA poses special problems because . . . 'touch DNA analysis cannot determine when an epithelial cell was deposited.'" (quoting *Reed*, 541 S.W.3d at 777)). This would be true even if Lopez's DNA was not present on the sweatshirt. *See Rivera*, 89 S.W.3d at 60 n.20 ("[T]he absence of appellant's DNA would not indicate innocence because it could simply mean none was deposited."). Additionally, Lopez admitted to police that she

16

was at the Wal-Mart with Garza and drove him to the crime scene, further undermining the significance of possibly finding Amanda's DNA on the sweatshirt. But even if Lopez is correct, and the video depicts Amanda inside the Wal-Mart with Garza, that would only prove that Amanda was with Lopez and Garza on the night of the murder. For instance, Lopez could have simply waited in the car while Amanda and Garza went inside the store. In any event, the fact that Lopez's daughter may have also participated in the murder would have no bearing on Lopez's conviction in this case as a conspirator. *See Ex parte Gutierrez*, 337 S.W.3d at 900; *Hall*, 569 S.W.3d at 656.

We conclude that Lopez failed to carry her burden to prove by a preponderance of the evidence that she would not have been convicted if exculpatory results had been obtained through DNA testing. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2)(A). Her sole issue is overruled.

## V. CONCLUSION

We affirm the order denying Lopez's motion for post-conviction DNA testing.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of July, 2024.

17