**Affirmed; Opinion Filed December 30, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00118-CR

**ANTONIO LAMAR COCHRAN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F15-76529-H**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Myers

Appellant Antonio Lamar Cochran was convicted of murder and sentenced to life

imprisonment and a $10,000 fine. In one issue, he argues the evidence is insufficient to show that

he murdered Zoe Hastings. We affirm.

### BACKGROUND AND PROCEDURAL HISTORY

The evidence at trial showed that on the evening of Sunday, October 11, 2015, Zoe

Hastings, 18 years of age, stopped briefly at a Walgreens on Garland Road to return a Redbox

movie on her way to a meeting at her church. The Walgreens was within sight of the home in east

Dallas where she lived with her parents and four younger siblings—three sisters and a brother.

After returning the movie to the Redbox kiosk at 4:42 p.m., Hastings returned to the driver's door

of the family minivan she was driving.

Two witnesses testified that they saw what happened next. Lester Lee Clark, a tattoo artist

who worked at a tattoo parlor located near the intersection of Garland Road and Peavy Road, in east Dallas, was walking to the store to buy a pack of cigarettes when he noticed a woman either returning a movie or getting one from the Redbox kiosk at the nearby Walgreens. She walked back to her minivan and was starting to get in, when a short, heavy-set African-American male rapidly approached her, grabbed the car door, and had a "kind of animated" conversation with her. Clark could not hear what they were saying but he estimated this animated conversation lasted no more than "[f]ive seconds." The woman then "scooted over or moved over" to the passenger side of the minivan, and the man "hopped in" and drove away. Clark thought they may have been boyfriend and girlfriend. He testified that later that day, at around dusk, he saw someone who may have been the man he had seen earlier walking down Garland Road, towards the Walgreens.

The other witness, Gary Whitman, a homeless man, was across the street from the Walgreens when he noticed a stout, heavy-set African-American man, about five feet and eight or nine inches in height, approach a blond, white female in a minivan. He was walking "aggressively in a sneaky way," as though he was "trying not to cause too much attention." The man came up behind the woman as she was trying to get in her car, and he put his arms out to keep her from getting away. There was a brief confrontation and the woman "acted like she was trying to get away." It looked like the man reached into his pocket—Whitman could not see what he had in his hand because he was too far away—and the woman "kind of gave in and got in the car after that." The man then got in the minivan's driver's seat and it sped off from the parking lot. Whitman tried to get across the street to help the woman but there was too much traffic and he "just couldn't make it in time." He could tell something was wrong and he did not have a phone, so he walked across the street to a convenience store and told them to call 911.[1]

---

[1] Dallas Police detective Scott Sayers testified that there was no record of a 911 call. Asked why he did not try to call the police himself, Whitman said he "didn't have no access to call the police." He also admitted, however, that there was a warrant out for his arrest for a probation violation at the time of Hasting's abduction, and that he "was a little scared."

Hastings had graduated from high school in May of 2015 and was preparing to go on a mission trip for her church in November of 2015, when she would have turned 19 years of age. She had plans to attend a mission "prep class" at her church on Sunday evening at around 5 o'clock, and she was expected to be home afterwards, at about 6:30 p.m., for a family dinner. She left the house at around 4:30 or 4:45 p.m., according to her mother, but Hastings never showed up for either the class or the dinner.

When she was late for dinner, her parents began texting and calling Hastings, to no avail, and they also contacted her friends, who told them she had not attended the church meeting. At around 10 p.m. that night Hastings's family contacted the police. A family member eventually figured out how to use the "find my phone" app to locate Hastings's phone, and it showed a nearby location that was about a five-minute drive from Hastings's home. Hastings's family drove to that location and saw emergency vehicles surrounding the area. Police informed them Hastings was dead.

Meanwhile, early on the morning of Monday, October 12, 2015, a man out walking his dog, Kurt Arnim, noticed another man running in his direction, trying to get his attention. He was "obviously very upset" and "very animated." The man said something to the effect of, "[T]here's a car and a girl down in this . . . creek," and he led Arnim to a creek located near the intersection Easton Road and Lippitt Avenue. Thick foliage and a steep embankment separated the creek bed from an adjacent, open field. When they reached the creek the man climbed down into the creek bed and, when he returned, he confirmed to Arnim that there was vehicle and a girl down there, and that she appeared to be dead. Arnim recalled that when the man climbed back up he "was visibly shaken." Arnim called 911 but the man walked away "in a hurry" before the police and emergency services personnel arrived.

Hastings was lying on her side, face down, about ten to twenty feet from the driver's door

of the minivan. She was lying in a pool of blood, with her dress pushed up above her waist and her underwear rolled down to her mid-thighs. She had been sexually assaulted, and her throat was cut multiple times. The driver's door of the minivan was open; the other doors were locked. The vehicle was resting nose-down in the creek bed, leaning against the steep embankment in an almost vertical position. Police found a bloodstained knife at the top of the embankment, above Hastings's body and the minivan. Hastings's phone was found at the crime scene, and location services data on the phone later revealed it was at the creek bed at 5:01 p.m. on Sunday evening, and it remained there until Monday morning.

Authorities identified Cochran as a suspect by comparing the DNA of several suspects to an unknown male DNA profile found on the knife's handle. This was "touch" or "handler" DNA, which occurs when a person touches something, potentially leaving behind their DNA profile. Testing revealed that the DNA from the knife handle matched Cochran's DNA. The DNA on the knife handle was a mixture of two contributors, Hastings and Cochran. According to Courtney Ferriera, a forensic pathologist with the Southwestern Institute of Forensic Sciences, the statistical probability of finding that same male DNA profile again was one in 15.7 quadrillion people. In other words, in a population of "2.06 million Earths," you would expect to find that DNA profile only once.

Multiple hairs were also collected from the crime scene and examined. DNA analysis determined that Cochran's mitochondrial DNA profile (mitochondrial DNA is inherited from a person's mother) could not be excluded from a "Negroid hair" found in Hastings's left hand, according to Gloria Jean Dimick, a mitochondrial DNA analyst. She explained that mitochondrial DNA is not a unique identifier, and it cannot identify a particular individual; however, it can be used to exclude people. It is typically used when nuclear DNA testing is not possible—for example, when the sample is highly degraded or environmentally challenged. Moreover, the hair

–4–

found in Hastings's left hand yielded a mixture of mitochondrial DNA profiles, which meant two or more mitochondrial profiles were present. With such mixtures, the lab cannot "tell you exactly the profiles contained in that mixture"; it can only determine "the number of possible profiles that could be generated from the information that we have." In this case, there were a total of 256 possible mitochondrial DNA profiles, and while Hastings and her relatives could be excluded as contributors, Cochran could not be excluded.

Y-STR DNA testing (which only examines the paternal line) was done on the sexual assault kit performed during Hastings's autopsy. An anal smear from the sexual assault kit showed the presence of a single sperm cell, indicating seminal fluid was present. This was the only sample that tested positive for the presence of seminal fluid. DNA analysis by the Department of Public Safety (DPS) crime lab in Houston on anal swabs from Hastings's sexual assault kit revealed a partial Y-STR DNA profile. A comparison of Cochran's Y-STR profile with that partial profile showed that Cochran's Y-STR profile matched up with the 16 loci (a loci is a location on the Y chromosome) in the partial profile; therefore, neither he nor his paternal line could be excluded as potential contributors.[2] A search of the U.S. Y-STR database showed that, at the 16 locations, the selected profile was found in zero of 5,305 total individuals in the database. The DPS Houston crime lab also found that the DNA extracts from vaginal swabs of Hastings in the sexual assault kit revealed a partial Y-STR DNA profile that was consistent with Cochran's Y-STR profile. Based on that sample, Cochran and his paternal relatives could not be excluded as the contributor of the DNA profile at the six locations in the partial profile—a profile that was found in zero of 6,824 total individuals in the database.

Additionally, the State presented evidence obtained from a data extraction performed on

---

[2] The samples were sent to the DPS crime lab in Houston because it possessed newer, more sensitive technology that examined 23 locations on male DNA, rather than the 17 locations that could be examined by the equipment at the DPS crime lab in Garland, where the samples were originally tested.

Cochran's cell phone, which included text messaging data and web search history. The text messaging data showed that at 1:48 a.m. on the date of the offense, Sunday, October 11, 2015, Cochran sent a text message to his housemate, Gilis Pina, stating that he was moving out of the house where he lived with Pina and Pina's family. Cochran concluded by saying that he would leave the key on the table and it would be the last "[you] ever heard from me." At 2:07 p.m. on October 11th, Cochran sent a text message to a number identified as belonging to Angie Simon, Cochran's ex-girlfriend, indicating that "Rena," who had been like a mother to him, had died the day before, and that she died "right in front of me." Cochran added that he was "terribly sad" and he had been crying for hours. In text messages sent to a person identified as "Mimi," at 2:25 p.m. and 3:19 p.m., Cochran indicated that he had been driving, drinking, and crying. According to the evidence, these were the last text messages sent from Cochran's phone prior to Hastings's abduction at 4:42 p.m., and no text messages were sent between 3:19 p.m. and 9:30 p.m. Then, at 9:30 p.m. on October 11th, the following text message was sent to Frank Torres, Gilis Pina's brother: "I really need u bro[.] I don[']t know wh[a]t to I[']m not well [Frank] to[o] much has happen[ed.] I need u bro[.]" In a text message sent at 10:40 p.m. to a person identified as "Selena," Cochran stated that his mother had died "last night in my face." At 9:35 p.m. on the evening of Monday October 12, 2015, the day after Hastings's murder, Cochran texted Angie Simon: "No I was for u and my life is over ull find out soon enough [sic]."

The web search history on Cochran's phone showed a total of 1,164 items. According to the report prepared by Detective Eric Weast, Dallas Police Department, and his testimony at trial, beginning on October 13, 2015, and continuing through October 23, 2015, the day before Cochran's arrest, the web search history on Cochran's phone showed thirty-two items pertaining to local news and crime. Five of these items specifically concerned Hastings's murder. By comparison, during the thirty days prior to October 11, 2015, the web search history showed only

a single item pertaining to news, and it was an article in the Daily Mail, a British news tabloid, about gang crime.

Analysis of cell phone tower location and mapping data provided by Detective Weast showed that at 4:34 p.m. on October 11, 2015, Cochran's cell phone communicated with a particular transceiver on a radio tower in Dallas, and in the general area covered by the transceiver included the location of Hastings's abduction—the Walgreens store. Then, at 5:47 and 5:48 p.m., Cochran's phone communicated with that same tower, but with a different transceiver on the tower. The general area covered by that transceiver also included the Walgreens.

Sy Ray of ZETX, which provides analytical consulting mapping software for cell phone data in criminal cases, testified that he examined three sets of records in this case—Hastings's AT&T records, Cochran's T-Mobile records, and data extracted from Cochran's mobile device—to map the location and movement of the phones on the date of the offense based on the activity of the user, incoming contacts, and data connections with cell towers. According to his testimony, at 1:14 a.m. on October 11th, Cochran's phone was in the area of Interstate 30 and Grove Hill Road in Dallas—the area of his home cell tower, the most commonly used tower for that device— and consistent with his home address. The next communications mapped from that same area occurred at 2:22 and 2:23 p.m. The device then traveled "slightly north to northeast," leaving the home base, and returned to the home cell tower at around 3:51 p.m. Data activity on the phone showed that it moved "basically south, southeast" at 4:34 p.m. In Ray's opinion, the data indicated that the phone "was at or in the area of the Walgreens" at 4:34 p.m. The next data connections occurred at 5:47 and 5:48 p.m., with the same cell tower but with different antennas on that tower, and still in the general area of the Walgreens. Then, by 6:55 p.m., the phone had returned to the home cell tower in the area of Cochran's residence.

The State also showed that Cochran had started a new job as a checker at a Fiesta Mart

grocery store on Friday, October 9, 2015. He worked on Saturday, October 10, 2015. He was scheduled to work on Monday, October 12th, but he did not show up for work that day.

A grand jury indicted Cochran for capital murder based on the murder of Hastings in the course of committing or attempting to commit a kidnapping. The jury found him guilty of the lesser-included offense of murder and, after hearing punishment evidence, sentenced him to life imprisonment and a $10,000 fine.

## DISCUSSION

In his only issue, Cochran contends the evidence is insufficient to prove he was the person who murdered Zoe Hastings. He argues that most of the physical evidence collected in this case "merely fails to exclude" him, and that the eyewitnesses could not identify him and they gave conflicting descriptions of the suspect. Cochran also argues that the strongest evidence was the "touch" or "handler" DNA profile from the handle of the knife used in the offense, which matched Cochran's DNA, but "'touch' or 'handler' DNA yields only a 'strong suspicion or mere probability of guilt[,]' which is legally insufficient."

In determining whether the evidence is sufficient to support a conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a factfinder could have found the essential elements of the charged offense was proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). The factfinder must resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (citing *Jackson*, 443 U.S. at 319). We presume the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We also defer to the factfinder's evaluation of the credibility and weight of the

evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The standard is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

Cochran was indicted for capital murder. The indictment alleged as follows:

That **ANTONIO LAMAR COCHRAN**, hereinafter called Defendant, **on or about 11th day of October, 2015** in the County of Dallas, State of Texas, did unlawfully then and there intentionally cause the death of ZOE HASTINGS, an individual, hereinafter called deceased, by INFLICTING INCISED WOUNDS TO THE NECK OF DECEASED WITH A KNIFE, A DEADLY WEAPON, and the defendant was then and there in the course of committing and attempting to commit the offense of KIDNAPPING of said deceased[.]

As we noted earlier, the jury convicted Cochran of the lesser-included offense of murder. The penal code provides that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1).

Cochran partially supports his argument that "touch" or "handler" DNA yields only a "strong suspicion or mere probability of guilt" by citing *Nowlin v. State*, 473 S.W.3d 312, 318 (Tex. Crim. App. 2015). In *Nowlin*, the court noted that while evidence leading to a "strong suspicion or mere probability of guilt" is insufficient to support a conviction, if the inferences made by the factfinder are reasonable in light of "the cumulative force of all the evidence when considered in the light most favorable to the verdict," the conviction will be upheld. *Id.* (quoting *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012)). Cochran also cites the following passage from *Hall v. State*, 569 S.W.3d 646 (Tex. Crim. App. 2019), where the court discussed "touch" DNA evidence:

Touch DNA poses special problems because "epithelial cells are ubiquitous on handled materials," because "there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them," and because "touch DNA analysis cannot determine when an epithelial cell was deposited."

*Id.* at 658 (footnotes omitted) (quoting *Reed v. State*, 541 S.W.3d 759, 776–77 (Tex. Crim. App.

2017)). Consequently, the court concluded, "the significant possibility of [touch] DNA being deposited by an innocent person reduces the probative value of any exculpatory [touch] DNA test result." *Id*.

*Hall*, however, concerned an appeal of a trial court's denial of DNA testing in a post-conviction Chapter 64 proceeding. *Id*. at 649. The court's discussion of "touch" DNA was in the context of applying the standard for granting or denying DNA testing in a Chapter 64 proceeding, where to warrant testing an applicant must "show that an exculpatory result on such a test would make a difference in Appellant's case." *See id*. In the present case, by contrast, we are required to determine whether the evidence is sufficient to support the conviction. When examining the legal sufficiency of the evidence, we "must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018) (citing *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017)). We do not evaluate the evidence piecemeal. Viewed under the appropriate standard, the evidence of guilt in this record can be fairly characterized as overwhelming.

Cochran argues in his brief that, although his DNA was found on the murder weapon, there is evidence he occasionally picked up knives at his job cleaning a movie theater. The theory, in other words, is presumably that appellant handled or recovered knives in his job at the movie theater; someone else had access to those knives; this person used one of those knives to kill Zoe Hastings; and the person did all of this without destroying or depleting Cochran's DNA or leaving any of his or her own DNA on the knife. But apart from vague testimony that Cochran may have handled or recovered knives at his movie theater job, there is no evidence to support this theory. Moreover, as the sole judge of the weight and credibility of the evidence, the jury was free to accept some, all, or none of a witness's testimony. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). A rational trier of fact could just as easily have concluded, given the

overwhelming evidence of guilt, that Cochran had access to knives in his movie theater job and that he used one of those knives to kill Hastings.

The jury heard the testimony of the witnesses and resolved any conflicting inferences. We defer to the jury's credibility and weight determinations. *See Jackson*, 443 U.S. at 326. Reviewing all the evidence in the light most favorable to the verdict, we conclude the jury could have rationally found beyond a reasonable doubt that appellant was guilty of murder. We overrule Cochran's issue.

/Lana Myers/  
LANA MYERS  
JUSTICE

Do Not Publish  
TEX. R. APP. P. 47.2(b)  
180118F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANTONIO LAMAR COCHRAN,
Appellant

No. 05-18-00118-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 1, Dallas County, Texas
Trial Court Cause No. F15-76529-H.
Opinion delivered by Justice Myers.
Justices Osborne and Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 30th day of December, 2019.