

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00012-CR

———————————————

RAYMOND EDWARD LUMSDEN, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F15-1103-211

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Raymond Edward Lumsden—who was convicted in 2016 of aggravated sexual assault of a child, indecency with a child, and criminal solicitation of a minor and whose conviction we affirmed on appeal[1]—appeals from the order denying his second and third motions for postconviction forensic DNA testing under Chapter 64 of the Texas Code of Criminal Procedure and his request for appointed counsel.[2] In a single issue, Lumsden argues that the trial court erred by denying his second and third motions in which he sought DNA testing of the victim's underwear that was not previously tested and retesting of the vaginal swabs. Because Lumsden failed to attach to his second motion an affidavit as required by Chapter 64 and included only conclusory statements about allegedly newer testing techniques to be used for retesting the vaginal swabs and because any DNA from Lumsden or his son that might be found on the victim's underwear would not exculpate Lumsden due to other substantial evidence of his guilt, we conclude that the trial court did not err by denying Lumsden's second and third motions for DNA testing. We therefore affirm.

---

[1]*See Lumsden v. State*, 564 S.W.3d 858, 866, 901 (Tex. App.—Fort Worth 2018, pet. ref'd).

[2]Lumsden does not appear to challenge the portion of the order that denied his request for the appointment of counsel. We therefore affirm that portion of the order.

## II. Background

### A.     The Trial Testimony

Our prior opinion set forth a thorough background of the facts.  *See Lumsden*, 564 S.W.3d at 866–74.  We therefore borrow the pertinent facts from it:

Allison,[3] who was almost nine years old at the time of the trial, testified that after her mother Kelly started dating Lumsden, they moved in with him.  Allison had her own room at Lumsden's house.

On the night in question, Kelly went to bed early because she was not feeling well.  Allison's brother David had also gone to bed.  Allison stayed up late watching television with Lumsden.[4]  At one point, she went upstairs to grab a blanket and a pillow because she was really sleepy.  She laid down beside Lumsden, who was sitting on the couch watching television.  While Allison was laying on her back on the couch, Lumsden put his pointer finger under her purple and pink monkey pajamas and under her panties and touched her "privates."  Allison said that Lumsden touched the outside of her private that she used to pee and that his pointer finger stayed still, which made her "[a] little uncomfortable."  Lumsden touched the inside of the part that Allison used to poop.  Allison testified that Lumsden wanted her to touch "the thing he went pee with," but she said no.  Allison became hungry and asked for red Jell-O, which Lumsden allowed her to have.  Afterwards, Lumsden went to bed, and she slept on the couch because she was too tired to go upstairs to her room.  Allison testified that the time on the clock reflected that it was midnight.

The next morning, after Kelly came downstairs and woke up Allison, Allison told her that Lumsden had touched her privates.  Kelly then took Allison to the police station, and from there, the police

---

[3]We used pseudonyms to refer to the complainant, her mother, and all minors. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).  We use those same pseudonyms in this opinion.

[4]No other individuals were in the home that night; John, who is Lumsden's son, testified that he was not at his dad's house on the night in question.  *Lumsden*, 564 S.W.3d at 872.

escorted Kelly and Allison to the hospital. Allison told a nurse what Lumsden had done to her and underwent a physical exam.

The following day, Allison recounted the touching to a forensic interviewer at the Children's Advocacy Center. . . .

. . . .

. . . Nurse Carriker testified that she performed Allison's physical exam at 2:00 p.m. on March 11, 2015, which was approximately fourteen hours after the incident. Nurse Carriker explained that during the exam, she noted "generalized redness" that covered Allison's vaginal area and a tear or a cut "barely inside the anal opening at about 7:00." Nurse Carriker testified that the redness on Allison's vagina was consistent with Allison's statement that Lumsden had put his finger there[5] . . . . Nurse Carriker swabbed Allison's mouth, vagina, anus, and fingernail area and combed through her hair to collect biological evidence.

. . . .

Ashleigh Berg, an investigator with the Denton County Sheriff's Office, testified that she went to Lumsden's residence . . . to execute a search warrant. Berg found blankets and a pillow on the couch, which looked like it "was made up into a bed," and were consistent with Allison's statement. Berg also found an empty serving cup of Jell-O on the top of the trash can in the pantry in the kitchen and the pull-off lid was on the countertop in the kitchen, which she testified was consistent with Allison's statement. . . .

. . . .

Christina Capt, who is a technical leader and a forensic DNA analyst with the University of North Texas Center for Human Identification, testified that the vaginal swabs that had been taken from Allison were used to develop an unknown Y STR profile. The buccal swabs from Lumsden were used to develop a known Y STR profile. Capt explained that the profile developed for Lumsden was compared to

---

[5]Nurse Carriker also testified that at the outset of meeting Allison, she asked Allison if she knew why she was at the hospital, and Allison told her that "Ray [had] touched her private part or her privates." *Id.* at 869–70.

4

the profile from Allison's vaginal swab, and "at all nine locations where we obtained data for the vaginal swab, there was an exact match with the alleles detected in Raymond Lumsden's profile." Capt testified that she was thus not able to exclude Lumsden from being a contributor to the unknown Y STR profile found in Allison's vaginal swabs. Capt further testified that six out of 10,000 people would have the same nine markers that were located in this case and that no other male contributors were detected on any of the items that were tested.

> . . . .

> Lumsden admitted that he could not explain the DNA evidence. Lumsden testified that his son John did not sexually assault Allison and that none of his other patrilineal relatives were in his home on the night in question.

*Id.* at 866–67, 870–74 (footnotes omitted).

## B.    Lumsden's Expert's Report

After Capt's testing, Lumsden had the vaginal swabs and anal swabs re-analyzed by Suzanna Ryan at Ryan Forensic in California. Ryan did not testify at trial, and thus her report was not admitted into evidence. Ryan's report, which was attached as an exhibit to Lumsden's third motion for DNA testing, included findings similar to Capt's:

> No male DNA results were obtained from the amplification of the anal swab sample. In fact, no male DNA at all was detected during the quantitation stage of analysis. The male quantitation system in use at the UNT laboratory is quite sensitive - capable of detecting the DNA from about 3 or 4 cells' worth of DNA, yet no male DNA was detected from this sample.
>
> . . . A low-level, partial, male profile has been detected in the vaginal swab sample. Re-analysis of the data at a lower analytical threshold than used by the UNT laboratory reveals the possible presence of more than one male individual . . . . However, a major male profile is

5

present[,] and this profile is consistent with Mr. Lumsden and with any paternally related male individual.

Ryan also opined in her report about the possibility of secondary DNA transfers:

4. The amount of male DNA detected on what has been labeled as the vaginal swab is very low level[,] and there is no way to determine, through DNA testing, whether the DNA was deposited via a direct contact or through an indirect (secondary) transfer. Considering that [Allison] and Mr. Lumsden [had been] residing in the home together for several months[,] there are many ways in which the DNA located in [Allison's] vaginal area could have transferred here.

It is known that DNA can transfer from person to person or from person to object through a direct contact. The amount of DNA that can transfer through direct contact varies from person to person but can range from no detectable DNA all the way up to 160 nanograms (Kamphausen) or 169 ng (Daty *et al*). It has also been illustrated through various peer-reviewed journal articles (Cale *et al*, for example) that DNA can transfer secondarily, through an intermediary. This can be from person to person to object or from person to object to person. An example would include the transfer of Person A's DNA to Person B's hands through a hug or handshake (direct transfer). Person A's DNA would then be available for further transfer onto an object that is touched by Person B (a cell phone, a door knob, a weapon) or even onto another location on Person B's body. For example, if Person B touched [his] face, neck, or genital area, it has been shown by Graham and Rutty and by Jones *et al* among others that DNA can transfer from a person's hands to other areas on [his] bod[y].

Secondary transfer can also occur from person to object to person. An example of this sort of transfer could be if Person A dried [his] hands on a towel, thus transferring [his] DNA to the towel (primary transfer). If Person B then used that same towel to dry [her] hands or body, [she] could inadvertently transfer some of Person A's DNA to [her] body during the drying process.

Secondary transfer of blood, saliva, vaginal secretions, and semen (as well as possibly skin cells) can also occur in the laundering process as

6

described by Noël *et al* and Kamphausen *et al* (2015) who both observed transfer of body fluids onto clean clothing items during the laundering process.

Noël *et al* found in their research that underwear of girls in volunteer family groups consistently demonstrated the presence of DNA from all members of the family, including the father, mother, and siblings. Y-STR testing would make it even more likely to detect [a] male family member's DNA on a female family member's underwear since it ignores the presence of female DNA.

In this case, since the laboratory did not analyze the underwear, it is unknown whether Lumsden's DNA is also present on [Allison's] underwear as "background" DNA from living in the same home as Lumsden and his male child. Any DNA present on [Allison's] underwear could easily transfer to her vaginal area while she was wearing the underwear. The possible low-level presence of more than one male individual at two loci could be further proof of some sort of secondary DNA transfer event.

5. Since a low amount of male DNA was detected in an excess of female DNA, Y-STR testing had to be conducted in this case in order to obtain any usable DNA results. However, Y-STR testing is different than traditional autosomal testing in that even when a full DNA profile is obtained, the lab can't identify one individual to the exclusion of all others.

Due to the paternal inheritance of the Y-chromosome, Mr. Lumsden's son (in fact, all of his paternal male relatives) would have exactly the same Y-STR profile[,] and it would be impossible to differentiate between the two individuals['] DNA based upon Y-STR testing. Considering this fact, it cannot be stated with any certainty that Lumsden's DNA is truly present in the vaginal area of [Allison]. First, only a partial profile has been obtained. If any of the 8 loci where no results were obtained happened to *not* be consistent with Lumsden, he would be 100% excluded as a possible contributor to the DNA profile. In addition, the DNA detected on the vaginal swab could just as easily be from a secondary transfer event involving Lumsden's son's DNA. If the two children shared a bathroom, bedroom, hamper, or other communal items[,] it would be very easy for DNA from Lumsden's son

to be picked up on [Allison's] hands or clothing and be further transferred to her vaginal area.

The longer a person lives in a particular home, the more of [his] DNA we would expect to find. Touch DNA can last for extended periods of time indoors with one study indicating full "touch" DNA profiles obtained up to 6 weeks after deposition (Raymond *et al*). This was the longest time period studied, so it is quite likely, and supported by anecdotal evidence, that touch or transfer DNA can remain for even longer time periods.

6. In this case it is impossible to determine how the male DNA arrived on the vaginal area of [Allison] (primary or secondary transfer)[,] and it is impossible to determine exactly whose DNA is actually present due to the partial Y-STR profile and the paternal inheritance demonstrated with Y-STR typing. It should be noted that the probability of randomly selecting an unrelated Caucasian individual who could also be a contributor to the partial profile obtained from the vaginal swab sample is 1 in 2,457 and, if even one of the 8 loci where no results were obtained is found to be inconsistent with Mr. Lumsden's known DNA profile[,] he would be eliminated as a possible contributor to the DNA detected in this sample.

## C.    The Postconviction Motions

After our opinion issued, Lumsden filed his first motion for DNA testing, which the trial court denied in April 2019.

The following April, Lumsden filed his application for writ of habeas corpus. In August 2020, the trial court recommended that Lumsden's application be denied.[6]

---

[6]After the parties filed their briefs, the Texas Court of Criminal Appeals denied Lumsden's application without a written order on June 2, 2021. *See* https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=b7e80ed3-6c7d-4da f-8a5e-7c9fef9e80e4&coa=coscca&DT=ACTION%20TAKEN&MediaID=4f3773f 4-ae43-4a05-af22-3659a8559177 (last visited Sept. 16, 2021).

In early November 2020, Lumsden, acting pro se, filed his second motion for DNA testing, requesting that "Y-Chromosome testing be used along with True[] Allel[e] testing on previously tested material and to test the underwear of the complainant[,] which has never been tested." He attached two articles on touch DNA and secondary transfer and one article on TrueAllele testing, but he did not attach an affidavit to his motion.

Later that November, Lumsden's postconviction counsel filed a third motion for DNA testing, requesting testing only of "the underwear the complainant wore the night of the assaults"; this motion did not request a specific type of testing other than one that employs "a scientific method sufficiently reliable and relevant to be admissible under Rule 702, Texas Rules of Evidence." The third motion attached, among other documents, an affidavit from Lumsden and Ryan's report.

Without holding an evidentiary hearing, the trial court denied Lumsden's second and third motions for DNA testing in a single order.

## III. Denial of Motions for Postconviction DNA Testing Was Proper

In a single issue, Lumsden argues that the trial court erred by denying his second and third motions for forensic DNA testing. Within his sole issue, Lumsden argues that newer technology—autosomal Y-STR testing—exists "that can identify the exact person the DNA belongs to, even between a father and his male children"; that identity is an issue; that the evidence was not previously tested through no fault of his own; and that the State's refusal to release biological evidence for testing and

the trial court's refusal to order DNA testing has deprived him of his liberty interests in utilizing state procedures to obtain reversal of his convictions. The crux of Lumsden's argument is that there was allegedly a secondary transfer of DNA in this case: Allison's underwear from that night might have Lumsden's or his "son's DNA on [it] from living in the same home for months, sharing laundry, etc." and that the DNA was then transferred from Allison's underwear to her vagina. As we explain below, the trial court did not err by denying Lumsden's motions for DNA testing when Lumsden failed to meet Chapter 64's prerequisites that require a convicted person (1) to attach to the motion an affidavit containing statements of fact in support of the motion, and (2) to show by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing.

## A. Standard of Review

The Texas Court of Criminal Appeals has explained the standard of review for Chapter 64 DNA testing as follows:

> In reviewing a judge's ruling on a Chapter 64 motion, this Court gives almost total deference to the judge's resolution of historical fact issues supported by the record and application-of-law-to-fact issues turning on witness credibility and demeanor. *Reed v. State*, 541 S.W.3d 759, 768 (Tex. Crim. App. 2017). But we consider *de novo* all other application-of-law-to-fact questions. *Id.* at 768–69.

*Ramirez v. State*, 621 S.W.3d 711, 718 (Tex. Crim. App. 2021).

**B.** **Standards to Obtain DNA Testing under Chapter 64**

To obtain postconviction DNA testing, the movant must meet the requirements of Article 64.03 of the Code of Criminal Procedure, which provides that

(a) A convicting court may order forensic DNA testing under this chapter only if:

(1) the court finds that:

(A) the evidence:

(i) still exists and is in a condition making DNA testing possible; and

(ii) has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(B) there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing; and

(C) identity was or is an issue in the case; and

(2) the convicted person establishes by a preponderance of the evidence that:

(A) the person would not have been convicted if exculpatory results had been obtained through DNA testing; and

(B) the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice.

Tex. Code Crim. Proc. Ann. art. 64.03(a).

We have explained when a person is entitled to DNA testing and the burden he must meet as follows:

> Under Article 64.03, a convicted person is not entitled to DNA testing unless he first shows that there is "greater than a 50% chance that he would not have been convicted if DNA testing provided exculpatory results." *Ex parte Gutierrez*, 337 S.W.3d 883, 899 (Tex. Crim. App. 2011) (quoting *Prible* [*v. State*], 245 S.W.3d [466,] 467–68 [(Tex. Crim. App. 2008)]); *see also Smith v. State*, 165 S.W.3d 361, 364 (Tex. Crim. App. 2005). This burden is met "if the record shows that exculpatory DNA test results, excluding the defendant as the donor of the material, would establish, by a preponderance of the evidence, that the defendant would not have been convicted." *Gutierrez*, 337 S.W.3d at 899. "A 'favorable' DNA test result must be the sort of evidence that would affirmatively cast doubt upon the validity of the inmate's conviction; otherwise, DNA testing would simply 'muddy the waters.'" *Id.* at 892.
>
> Generally, a movant does not satisfy his burden under Article 64.03 if "the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing." *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010); *see also Dunning v. State*, 572 S.W.3d 685, 698 (Tex. Crim. App. 2019) ("When the true exculpatory value of the test results are weighed against all of the inculpatory evidence, we conclude that Appellant has not shown that, had the results been available during the trial of the offense, it is reasonably probable that he would not have been convicted.").

*Copple v. State*, No. 02-19-00120-CR, 2020 WL 101867, at *4 (Tex. App. —Fort Worth Jan. 9, 2020, no pet.) (mem. op., not designated for publication).

Additionally, the motion seeking DNA testing must meet specific statutory requirements. The statute enumerates the following requirements that are relevant to the context of Lumsden's motions:

> (b) The motion may request forensic DNA testing only of evidence described by Subsection (a–1) that was secured in relation to the offense

12

that is the basis of the challenged conviction and was in the possession of the [S]tate during the trial of the offense, but:

> (1) was not previously subjected to DNA testing; or
>
> (2) although previously subjected to DNA testing:
>
> > (A) can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test[.]

Tex. Code Crim. Proc. Ann. art. 64.01(b)(1), (2)(A).[7] Further, the motion "must be accompanied by an affidavit, sworn to by the convicted person, containing statements of fact in support of the motion." *Id.* art. 64.01(a–1).

The Austin Court of Appeals recently noted,

> For retesting, "the convicted person must show that although previously subjected to DNA testing, the evidence can be subjected to testing with newer techniques that provide a reasonable likelihood of results that are more accurate and probative than the results of the previous test." *See Padilla v. State*, Nos. 03-12-00299[-CR, 03-12-00300-CR, 03-12-]00301-CR, 2013 WL 3185896, at *5 (Tex. App.—Austin June 20, 2013, pet. ref'd) (mem. op., not designated for publication). "To meet this burden, the convicted person must provide statements of fact in support of his claims; general, conclusory statements are insufficient." *Id.*

*In re Keller*, No. 03-18-00420-CR, 2019 WL 1561817, at *5 (Tex. App.—Austin Apr. 11, 2019, pet. ref'd) (mem. op., not designated for publication).

---

[7]Article 64.01 does not specify the level of accuracy that the requested newer testing techniques must achieve in order for the trial court to grant a motion requesting retesting. But Article 64.03(d)(2) states that if the court orders DNA testing, "the court shall include in the order requirements that[] the DNA testing employ *a scientific method sufficiently reliable and relevant to be admissible under Rule 702*, Texas Rules of Evidence." *See id.* art. 64.03(d)(2) (emphasis added).

13

### C. Analysis

#### 1. As an initial matter, we assume that Lumsden preserved the main argument that he makes in this appeal.

The State contends that Lumsden did not argue in the trial court for the testing technique that he requests in his appellate brief. The State points out that Lumsden's second motion for DNA testing requested "Y-Chromosome testing be used along with True[]Allel[e] testing"; that Lumsden's third motion for DNA testing did not request a specific type of testing; and that Lumsden's brief requests "autosomal Y-STR testing." We recognize that the wording varies between Lumsden's second motion and his brief, but without a more detailed explanation of the various types of DNA testing, we are not in a position to decide whether "Y-Chromosome testing . . . along with True[]Allel[e] testing" differs from or is a type of "autosomal Y-STR testing." Broadly construing Lumsden's arguments to challenge the trial court's denial of these types of testing, we will assume that he preserved his complaint for appeal. *See* Tex. R. App. P. 38.9.

### 2. The trial court properly denied retesting of the vaginal swabs.[8]

Lumsden's second motion for DNA testing requested retesting of the vaginal swabs that were collected during Allison's physical exam at the hospital. Lumsden's second motion for DNA testing is deficient in its attempt to allege that the biological material on the vaginal swabs "can be subjected to testing with newer testing techniques that provide a reasonable likelihood of results that are more accurate and

---

[8]Lumsden's brief initially states that he seeks testing of Allison's underwear and retesting of "all of the swabs previously tested only for Y-STR." However, Lumsden is not consistent in what items he wants tested or retested. In one place in his brief, Lumsden seeks "DNA testing of the untested underwear"; in another place, he states that "a full [DNA] profile could be found on the underwear, or other untested items"; and then he prays that "this [c]ourt order [that] DNA testing be done on all of the untested materials in the [S]tate's possession, as well as retesting on the vaginal swabs."

To the extent that Lumsden challenges the trial court's denial of his request for testing of untested items other than Allison's underwear, we overrule that challenge. He has not identified the other items that were not tested for DNA (which the record lists as the other items in the sexual assault kit—oral swabs and smear, a reference buccal sample, fingernail scrapings, and head hair combing and comb—and one of Lumsden's reference buccal swabs), nor has he provided any discussion or analysis about these items, much less attempted to meet the Chapter 64 threshold showing that there is a greater than 50% chance that he would not have been convicted if DNA testing showed that his or another person's DNA was on such items.

Similarly, to the extent that Lumsden challenges the trial court's denial of his request to retest previously tested swabs other than the vaginal swabs, we overrule that challenge because he has not explained how retesting the anal swabs—the only other swabs that the record shows were tested for DNA—would exculpate him when the record demonstrates that no male DNA was obtained from the anal swabs.

We therefore limit our review and analysis to the trial court's denial of testing for Allison's underwear and retesting of the vaginal swabs.

probative than the results of the previous test." *See* Tex. Code Crim. Proc. Ann. art. 64.01(b)(2)(A). As explained below, Lumsden's conclusory statements about the newer testing technique that he requested to be employed and his failure to attach an affidavit or unsworn declaration prevent him from meeting the prerequisites of Chapter 64 to obtain retesting of the vaginal swabs. Alternatively, he fails to show by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through retesting of the vaginal swabs.

With regard to the vaginal swabs, Lumsden's second motion for DNA testing requested that "Y-Chromosome testing be used along with True[]Allel[e] testing." Lumsden's second motion then contains four statements about the TrueAllele testing that is apparently performed by a company named Cybergenetics:

> Cybergenetics current[ly] employs a scientific testing that they call[] "TrueAllel[e] Testing." In this testing, they are able to determine identity, or lack thereof, by using these testing procedures. In fact, so much so, that numerous Innocence Project[s] across the country have used them to obtain evidence sufficient to exon[]erate those wrongfully convicted such as Lumsden was. More so, Lumsden can use Cybergenetics to prove beyond a shadow of a doubt that the [S]tate knowingly used false scientific expert testimony to obtain a conviction, something the [S]tate has basically already done in their responses and exhibits[] but fail to admit.

Lumsden's second motion was not accompanied by an affidavit containing statements of fact in support of his motion. The only documents accompanying his

16

motion are three articles.  Of the three articles,[9] only an article from *The Atlantic* references the TrueAllele testing from Cybergenetics:

> [Mark] Perlin[, the CEO of the DNA-testing firm Cybergenetics,] grew interested in DNA-typing techniques in the 1990s, while working as a researcher on genome technology at Carnegie Mellon, and spent some time reviewing recent papers on forensic usage.  He was "really disappointed" by what he found . . . :  Faced with complex DNA mixtures, analysts too frequently arrived at flawed conclusions.  An experienced coder, he set about designing software that could take some of the guesswork out of DNA profiling.  It could also process results much faster.  In 1996, Perlin waved goodbye to his post at Carnegie Mellon, and together with his wife, Ria David, and a small cadre of employees, focused on developing a program they dubbed TrueAllele.
>
> At the core of TrueAllele is an algorithm:  Data from DNA test strips are uploaded to a computer and run through an array of probability models until the software spits out a likelihood ratio—the probability, weighed against coincidence, that sample X is a match with sample Y.  The idea . . . was to correctly differentiate individual DNA profiles found at the scene of a crime.  [For] example:  A lab submits data from a complex DNA mixture found on a knife used in a homicide.  The TrueAllele system might conclude that a match between the knife and a suspect is "5 trillion times more probable than coincidence," and thus that the suspect almost certainly touched the knife.  No more analysts squinting at their equipment, trying to correspond alleles with contributors.  [According to Perlin,] "Our program . . . is able to do all that for you, more accurately."

Matthew Shaer, *The False Promise of DNA Testing,* The Atlantic, June 2016 (https://www.theatlantic.com/magazine/archive/2016/06/a-reasonable-doubt/480747/) (last visited Sept. 16, 2021).  However, the article further states that Cybergenetics has declined to make public the algorithm that drives the program; thus, its critics state that it creates "a black-box situation":  "The data go in, and out comes the solution,

---

[9]The remaining articles discuss touch DNA and secondary transfer of DNA.

and we're not fully informed of what happened in between." *Id.* The 2016 article

goes on to state that "TrueAllele is just one of a number of 'probabilistic genotyping'

programs developed in recent years—and as the technology has become more

prominent, so too have concerns that it could be replicating the problems that it aims

to solve." *Id.* The article details how the Legal Aid Society of New York successfully

challenged a comparable software program, the Forensic Statistical Tool (FST):

> In 2011, Legal Aid requested a hearing to question whether the software
> met the Frye standard of acceptance by the larger scientific community.
> To [the Legal Aid attorney] and her team, it seemed at least plausible that
> a relatively untested tool, especially in analyzing very small and degraded
> samples (the FST, like TrueAllele, is sometimes used to analyze low-
> copy-number evidence), could be turning up allele matches where there
> were none[] or missing others that might have led technicians to an
> entirely different conclusion. And because the source code was kept
> secret, jurors couldn't know the actual likelihood of a false match.
>
> At the hearing, bolstered by a range of expert testimony, [the
> Legal Aid attorney] and her colleagues argued that the FST, far from
> being established science, was an unknown quantity. (The medical
> examiner's office refused to provide Legal Aid with the details of its
> code; in the end, the team was compelled to reverse-engineer the
> algorithm to show its flaws.)
>
> [The court] agreed. "Judges are, far and away, not the people best
> qualified to explain science," he began his decision. Still, he added,
> efforts to legitimize the methods "must continue, if they are to
> persuade." The FST evidence was ruled inadmissible.

*Id.*

This article raises questions about the reliability of TrueAllele and similar

testing. The only claim regarding the accuracy of TrueAllele is a self-serving

statement by the CEO of the company that developed it. And Lumsden provided no

18

affidavit and no third-party evidence showing that TrueAllele testing is more accurate and probative than the results of the previous testing on the vaginal swabs; thus, his motion contains merely conclusory statements, which are insufficient.[10] *See Manns v. State*, No. 02-19-00312-CR, 2020 WL 1466314, at *8 (Tex. App.—Fort Worth Mar. 26, 2020, no pet.) (mem. op., not designated for publication); *Keller*, 2019 WL 1561817, at *5.

Additionally, to the extent that Lumsden seeks retesting using autosomal Y-STR testing, he provided only conclusory statements about this type of testing as well. As noted above, he did not request autosomal Y-STR testing in his second motion. And although the third DNA motion attached an affidavit from Lumsden and Ryan's report, the motion makes no mention of autosomal Y-STR testing because it seeks testing solely of the underwear, not retesting of any items, and thus did not need to establish that a newer testing technique exists that is more accurate and probative than the results of prior testing. *Compare* Tex. Code Crim. Proc. Ann. art. 64.01(b)(1), *with id.* art. 64.01(b)(2)(A). The only mention of autosomal Y-STR testing is in Ryan's report, and the single-sentence reference implies that it might be more accurate than

---

[10]Moreover, although the article from *The Atlantic* does not state when TrueAllele's development was complete, it states that Perlin and his wife focused on developing it in 1996, and the article was published in June 2016, which was prior to Lumsden's September 2016 convictions. *See id.* Thus, it appears that the allegedly "newer testing technique" that Lumsden relies on may have already been in existence at the time of his trial in 2016. *See Aekins v. State*, No. 03-16-00598-CR, 2017 WL 2333213, at *7 n.4 (Tex. App.—Austin May 25, 2017, pet. ref'd) (mem. op., not designated for publication).

traditional Y-STR testing, but the sentence does not provide enough information or detail to be more than a general, conclusory statement.

Lumsden thus failed to meet the requirements of Article 64.01 in order for the trial court to order retesting of the vaginal swabs with the techniques he requested. *See id.* art. 64.01(a–1), (b)(2)(A); *Nall v. State*, No. 02-19-00008-CR, 2019 WL 2635571, at *4 (Tex. App.—Fort Worth June 27, 2019, pet. ref'd) (per curiam) (mem. op., not designated for publication) (holding that appellant failed to carry his burden to establish his entitlement to postconviction DNA testing for previously tested items because he provided no evidence or explanation that new testing techniques would provide more accurate or probative testing); *Trevino v. State*, No. 04-18-00412-CR, 2019 WL 1370158, at *3 (Tex. App.—San Antonio Mar. 27, 2019, pet. ref'd) (mem. op., not designated for publication) (same, collecting cases); *see also Marks v. State*, No. 2-09-144-CR, 2010 WL 598459, at *1 (Tex. App.—Fort Worth Feb. 18, 2010, no pet.) (mem. op., not designated for publication) (upholding denial of motion for DNA testing because appellant did not support his motion with an affidavit as required by Article 64.01(a), nor did he affirm that all factual allegations in the motion were true).

Alternatively, even if retesting of the vaginal swabs showed that Lumsden's son's DNA was part of the DNA mixture, such evidence is not exculpatory evidence in this case due to the additional evidence presented at trial. As set forth above, Lumsden's son was not present at the home on the night in question and was never mentioned by Allison as the perpetrator. Allison mentioned only one perpetrator, and

20

when she was asked to describe the events to her mother, the nurse, and the forensic interviewer, she consistently said that Lumsden was the person who had touched her privates. And Allison's testimony about the events was supported by the findings during her physical exam. Thus, even if the vaginal swabs were retested and were found to contain Lumsden's son's DNA in addition to Lumsden's DNA, Lumsden has not established by a preponderance of the evidence that he would not have been convicted if the jury had heard that DNA from a third-party (his son) was also present in the DNA mixture on the vaginal swabs. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A); *Prible*, 245 S.W.3d at 470.

Accordingly, we hold that the trial court did not err by denying retesting of the vaginal swabs under Chapter 64.

### 3. The trial court properly denied testing of Allison's underwear.

Both Lumsden's second and third DNA motions requested testing of Allison's underwear, which had not previously been tested for DNA.[11] Lumsden argues that DNA testing on Allison's underwear will uncover his and his son's DNA. The crux of Lumsden's argument is that if retesting of the vaginal swabs reveals that the other male DNA in the mixture on the swab came from Lumsden's son and if testing of Allison's underwear reveals DNA from both Lumsden and his son, then the DNA on the vaginal swab came from the DNA on the underwear via "innocent" secondary

---

[11]The underwear was tested by UNT for semen and spermatozoa. The presumptive test for semen was negative, and spermatozoa were not detected.

transfer in the laundry. Because, as we explain below, other evidence demonstrates that Lumsden was the perpetrator, and because Lumsden has not shown by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing of the underwear, we cannot conclude that the trial court erred by denying testing of Allison's underwear.

Lumsden quotes a portion of the Texas Court of Criminal Appeals' decision in *Dunning*, stating that "[t]ouch DNA poses special problems." 572 S.W.3d at 693. Lumsden seems to rely on *Dunning* solely for the premise that touch DNA easily transfers, and thus Lumsden uses that premise to attempt to show that the State's expert "flat-out [lied] during her trial testimony" when she "told the jury that touch DNA couldn't transfer" and that "she 'would think it would have to be a biological fluid.'" Lumsden, however, ignores the portions of *Dunning* that are damaging to his premise.

Before setting forth the holding in *Dunning* that cuts against Lumsden's premise, we begin by setting forth some background about the third-party touch DNA that was discovered in *Dunning*:

> With respect to the third-party DNA found in the crotch area [of the victim's shorts], [the State's expert] cautioned against jumping to the conclusion that the third-party DNA was from the "real" perpetrator. He said that the DNA samples from this case were all low-level trace DNA, also referred to as touch-transfer DNA or "touch" DNA, and he explained that there are many innocent ways by which low-level trace DNA can be transferred to an item of clothing. For example, he testified that it can be transferred between clothes that are washed together. Because of that, [the State's expert] thought that the probative

22

value of the sample was low because it merely showed that someone else had touched the shorts at some point, and that, even then, the DNA was not necessarily from the person who [had] touched the shorts. We have expressed similar concerns: "[T]ouch DNA poses special problems because 'epithelial cells are ubiquitous on handled materials,' because 'there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them,' and because 'touch DNA analysis cannot determine when an epithelial cell was deposited.'" *Hall v. State*, . . . 569 S.W.3d 646, 658 . . . (Tex. Crim. App. . . . 2019). Consequently, we said, "the significant possibility of [touch] DNA being deposited by an innocent person reduces the probative value of any [touch] DNA test result." *Id.*

*Id.* at 693. The Texas Court of Criminal Appeals relied on testimony from the State's expert, who had reviewed the defense expert's findings, and found that his testimony was more probative than the touch DNA found in the crotch of the victim's shorts:

[The State's expert] testified that, generally, touch DNA is typically low-level, and as a result, is difficult to analyze, and that it is easily transferred to clothes. According to [the State's expert], he finds mixtures of touch DNA from innocent people on clothing "all the time."

We agree with the State that the court of appeals erred because it failed to defer to the trial court's implicit determination that [the State's expert's] testimony was credible. When that determination is accorded its proper deference, the results revealing third-party touch DNA from the crotch area of the shorts were significantly less probative than the court of appeals concluded.

*Id.* at 694. The Texas Court of Criminal Appeals specifically called out the court of appeals (this court) for "accord[ing] too much value to the presence of the third-party DNA found in the crotch area, but [in] reach[ing] that conclusion, it had to disbelieve [the State's expert's] testimony about the low probative value of the touch DNA." *Id.* at 693–94 (footnote omitted). Lumsden requests that we do exactly what the Texas

23

Court of Criminal Appeals proscribed: place much value on the presence of any third-party DNA that might be found on Allison's underwear. We decline to do so.

In order to obtain testing of the untested underwear, it was Lumsden's burden to establish by a preponderance of the evidence that he would not have been convicted if DNA testing provided exculpatory results. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A); *Copple*, 2020 WL 101867, at \*4. Lumsden did not satisfy his burden under Article 64.03 because the record contains other substantial evidence of guilt independent of that for which he seeks DNA testing. Here, even assuming that DNA testing on Allison's underwear would show that Lumsden's son's DNA is present, Lumsden failed to show how that would exculpate him when the record contains other substantial evidence of guilt:

- Allison told her mother, Nurse Carriker, and the forensic examiner that Lumsden had touched her privates; Allison did not mention being touched on her privates by any other male.

- During Allison's physical exam, Nurse Carriker noted "generalized redness" that covered Allison's vaginal area.

- Nurse Carriker testified that the redness on Allison's vagina was consistent with Allison's statement that Lumsden had put his finger there.

24

- Lumsden was the only male in his lineage who was present at the house on the night in question; his son was not home.

- And Lumsden could not be excluded as a contributor to the male DNA that was found on the vaginal swab.

The presence of Lumsden's son's DNA on Allison's underwear will not, without more, constitute affirmative evidence of Lumsden's innocence. *See Bell v. State*, 90 S.W.3d 301, 306 (Tex. Crim. App. 2002).

And further assuming that DNA testing on Allison's underwear would reveal that it contains Lumsden's DNA, we cannot make the leap, as Lumsden does, that the presence of his DNA on the underwear would prove that his DNA on the vaginal swab was there merely because his underwear transferred DNA to Allison's underwear via the laundry and that her underwear in turn transferred his DNA to her vagina. Although Ryan opines in her report that such transfers are possible, she supports her opinion with summaries of studies and articles that deal with finding DNA and sperm only on female underwear that had been washed with underwear from male family members. She does not describe any study in which the female in the prior studies and articles had a vaginal swab taken after wearing the laundered underwear and that the vaginal swab showed the presence of the male family members' DNA. Additionally, Ryan's report mentions that person-to-object-to-person transfers are possible. But for Lumsden's DNA to be transferred to Allison's

25

vagina according to Lumsden's alleged "innocent transfer theory," it would be in the nature of person (Lumsden) to object (his underwear) to object (Allison's underwear via the laundry) to person (Allison's vagina). Neither the articles attached to Lumsden's second motion nor the articles described in Ryan's report describe studies of such attenuated DNA transfers. The trial court was therefore free to believe the evidence presented at trial and to conclude that DNA testing of Allison's underwear would not exonerate Lumsden but would likely reveal the presence of his DNA—not due to an innocent transfer via the laundry but because he put his finger in her underwear when he touched her vagina.

Based on the Texas Court of Criminal Appeals' low view of touch DNA, the substantial evidence of guilt presented at trial, and the lack of evidence substantiating the multitudinous DNA transfers that Lumsden alleges occurred here, Lumsden has not demonstrated by a preponderance of the evidence that, even if exculpatory results were obtained, there exists a greater than 50% likelihood that he would not have been convicted. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A).

Accordingly, we hold that the trial court did not err by denying DNA testing of Allison's underwear.

### 4. We need not address Lumsden's remaining arguments regarding his alleged compliance with the other Chapter 64 prerequisites.

To succeed on his motions for postconviction DNA testing, Lumsden was required to establish all of Chapter 64's requirements. *See Trevino*, 2019 WL 1370158,

26

at *3 (citing *Swearingen*, 303 S.W.3d at 731). Because we have determined that Lumsden failed to establish the requirements for retesting the vaginal swabs under Article 64.01(a–1) and (b)(2)(A) and Article 64.03(a)(2)(A) and for testing the underwear under Article 64.03(a)(2)(A), we need not decide if Lumsden established Chapter 64's other prerequisites to obtain DNA testing. *See id.*; *see also* Tex. R. App. P. 47.1.

        **5.      Lumsden's constitutional arguments are inadequately briefed, and there is no constitutional right to postconviction DNA testing.**

Lumsden's final argument in his brief raises what appears to be a constitutional issue. He contends that the State's refusal to release biological evidence for testing and the trial court's refusal to order DNA testing on the requested items "has deprived [him] of his liberty interests in utilizing state procedures to obtain reversal of his conviction and prove his innocence." Lumsden cites no law—other than Chapter 64 generally—to support his argument, nor does he mention what constitutional amendments provide the liberty interests that he alleges he has been deprived of. We hold that Lumsden has forfeited this argument due to inadequate briefing. *See* Tex. R. App. P. 38.1(i); *Dupree v. State*, No. 02-15-00332-CR, 2016 WL 4538598, at *5 (Tex. App.—Fort Worth Aug. 31, 2016, no pet.) (per curiam) (mem. op., not designated for publication). Alternatively, even if Lumsden had properly briefed this argument, there is no freestanding due-process right to DNA testing. *See Ramirez*, 621 S.W.3d at 717; *Gutierrez*, 337 S.W.3d at 889; *see also Ex parte Mines*, 26 S.W.3d 910, 914 (Tex. Crim.

27

App. 2000) (stating that there is no constitutional right to postconviction DNA testing).

### 6.    We dispose of Lumsden's sole issue.

Having analyzed Lumsden's dispositive arguments, we conclude that the trial court did not err by denying Lumsden's second and third motions for postconviction DNA testing.[12] *See* Tex. R. App. P. 47.1.  Accordingly, we overrule his sole issue.

### IV.  Conclusion

Having overruled Lumsden's sole issue, we affirm the trial court's order denying Lumsden's second and third motions for postconviction DNA testing and his request for appointed counsel.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  September 23, 2021

---

[12]In his brief, Lumsden requests that we appoint his postconviction counsel to present oral argument.  Because this case was submitted without oral argument, we deny that request as moot.  To the extent that Lumsden's brief raises other arguments in this appeal broadly challenging his convictions on other grounds (e.g., ineffective assistance for failing to properly request funding for expert testimony at trial), those challenges are beyond the scope of a Chapter 64 proceeding, and we do not consider them.  *See Ford v. State*, No. 02-18-00080-CR, 2018 WL 4627163, at *2 (Tex. App.—Fort Worth Sept. 27, 2018, no pet.) (mem. op., not designated for publication).