

## NUMBER 13-21-00356-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

**MARK EDWARD JACKSON JR.,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                    **Appellee.**

### On appeal from the 24th District Court
### of Calhoun County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Mark Edward Jackson Jr. appeals the trial court's denial of his post-conviction motion under Chapter 64 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. arts. 64.01, 64.03. By what we construe as two issues, appellant contends that the trial court erred in denying his (1) motion for DNA testing and (2) request for appointment of counsel. We affirm.

## I.    BACKGROUND

On August 11, 2003, appellant pleaded guilty to aggravated robbery, occurring on or about November 26, 2002, at a Speedy Stop in Port O'Connor, Texas. *See* TEX. PENAL CODE ANN. § 29.03(a)(2).

### A.    Pretrial Admonishments

Prior to the trial court's acceptance of appellant's guilty plea, the following colloquy occurred between appellant and his retained trial counsel:

[Counsel:]    And you stated that you wished to plead guilty, did you not?

[Appellant:]    Yes, sir.

[Counsel:]    Are you under any promises, threats[,] or coercion to plead guilty?

[Appellant:]    No, sir.

[Counsel:]    Has anybody promised you anything to plead guilty?

[Appellant:]    No, sir.

. . . .

[Counsel:]    Okay. Have we had an opportunity to talk about the facts and circumstances regarding this case?

[Appellant:]    Yes, sir.

[Counsel:]    Have we had a chance to talk about the defenses or possible defenses involved in this case?

[Appellant:]    Yes, sir.

[Counsel:]    And have we investigated those to your satisfaction?

[Appellant:]    Yes, sir.

[Counsel:]   And are you satisfied with where you[ ar]e at the present time in terms of pleading guilty because you are guilty?

[Appellant:]   Yes, sir.

The trial court then admonished appellant of the consequences of pleading guilty.

## B.   Trial Evidence

The State thereafter tendered into evidence appellant's signed judicial confession and the Calhoun County Sheriff's Department investigative report containing, in relevant part, appellant's written confession to police and written statements from co-defendants, Sarah Reed and Justin Pope.

In a written statement provided to law enforcement dated December 5, 2002, appellant admits he "walked into a Speedy[ S]top store in Port O'Conn[o]r, Texas" wearing a "toboggan [hat] on [his] head" and "a towel around [his] face" and "pulled a gun out." Appellant ordered two clerks onto the ground, "pointed" a "44 caliber revolver pistol" at them, and "demanded money" from the cash register and safe. Appellant named Pope and Reed, his cousin, as his co-conspirators. According to appellant, Reed worked at the store and "told [him] where all the money would be." Pope drove appellant to the store, "dropped [him] off," and waited "down the road" while appellant ran in. Appellant stated he stole "a little over $6,000.00," which was "split . . . three ways" between himself, Pope, and Reed once they were back at Reed's residence.

In Reed's written statement, dated December 4, 2002, she identified appellant as the individual responsible for bringing "up the idea of robbing the Speedy Stop," her place of employment. Reed enlisted Pope to help, and she told the two men about the safe and where they could find the store's surveillance recording system. Reed stated that Pope

3

provided the gun and transportation. Appellant and Pope left Reed's residence at approximately 11:20 p.m. on the night of the robbery, and Reed stayed behind. When appellant and Pope returned a short while later, the three divided the money in Reed's attic. Reed estimated she was given "about two grand, maybe three."

On December 2, 2002, Pope gave a written statement to police, implicating appellant in the robbery. Pope denied Reed's involvement, stating, "[Appellant] said he knew how to do it and everything but just needed a driver. He told me he had been planning it since he got in town." On the evening of the robbery, Pope stated that he and appellant left Reed's residence in Pope's truck at "[a]bout 11:20 [p.m.]" Pope said appellant put on "layers of clothes" to give himself the appearance of being "bigger than he really is." Appellant entered the Speedy Stop alone. Pope approximated that he waited in the truck for appellant for "15 minutes at the most" before appellant returned "carrying a white plastic grocery type bag." Pope identified the weapon used by appellant as a "Smith and Wesson .44 magnum" and claimed it belonged to appellant. Pope said he and appellant divided the "seven, maybe eight thousand dollars" amongst themselves and discarded the gun and money bags in the nearby canal.

During the punishment phase of trial, Kristy Heizer and Autumn Rhyne, the two store clerks working on November 26, 2002, testified. Heizer stated that a man wearing a mask and "ski hat" came through the door with a "gun pointed at [her]" and ordered her to drop to the floor. After money was taken from the cash register, the robber demanded keys to the office to get the "tape."[1] Rhyne presented substantially similar testimony,

---

[1] The store's surveillance cameras recorded footage onto videotape cassettes.

4

describing the offender as masked and stating that he had also pointed a gun at her during the course of the robbery.

Heizer testified that prior to trial, appellant's "mother had stopped by to see [her] and had asked [her] if it would be all right if [appellant] sent [her] a letter." The letter was admitted at trial and reads in its entirety:

Christy [sic],

Hi[.] How are you doing? Look, I know it may feel a little uncomfortable to hear from me, but I have a couple of things I want to say to you. [F]irst of all from the bottom of my heart I'm very very sorry for my stupidity, Mrs. Christy [sic]. I[']m not sorry because I got caught[.] I'm sorry because I know better than to do what I did, and I feel I owe you my life. I was really messed up on drugs, and I was scared in[]to what I did. Hanging with the wrong people and drugs are very se[]riously neg[a]tive and wrong. I guess I had to learn the hard way. I hope you one day forgive me. I've found [G]od, and I pray for you. I pray that you[ are] safe and that I haven't had a major effect on you in any way. Look, when I get out, if I ever do, I want to do something for you. I really feel I owe you. Even if [i]t[']s to mo[w] your grass for a few summers. Whatever it may be, I[']ll be there. [Smiley face drawing] Well, I[']m going to go ahead and let you go ok. I hope you have a wonderful[] day.

P.S. Deep in my heart I <u>never</u> had <u>no</u> [sic] intention to hurt anyone!! Everyone that knows me knows I have a good heart.

Sincer[e]ly,
Mark Jackson

Michael Wayne Kovarek, an investigator with the Calhoun County Sheriff's Office, testified that he reviewed surveillance footage of the November 26, 2002 robbery, and the investigation[2] ultimately led them to Reed's residence on December 2, 2002, where

---

[2] Investigator Kovarek's report indicates that he received information from a named but otherwise unaffiliated third-party, which indicated that appellant had "recently made comments as to how easy it would be to 'knock over the store.'"

5

they located Pope and observed clothes laid out in plain view matching the ones worn by the suspect in the surveillance video. Pope provided a statement, and that information was later used to obtain arrest warrants for Reed and Jackson.[3] Investigator Kovarek testified that "money bags" were found in Reed's attic, and the weapon believed to have been used in the robbery was ultimately identified as belonging to Pope's father. The gun was retrieved from Pope's father's "shop" on December 3, 2002.

Appellant was sentenced to forty-five years' imprisonment.

## C.    Post-Conviction Proceedings

Appellant pursued a direct appeal, and this Court affirmed the trial court judgment. *See Jackson v. State*, No. 13-03-527-CR, 2004 WL 5050472, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 19, 2004, no pet.) (mem. op., not designated for publication).[4]

On August 10, 2021, appellant filed a post-conviction motion under Chapter 64, which the trial court denied. *See* TEX. CODE CRIM. PROC. ANN. art. 64.01 (providing for the procedure to obtain post-conviction DNA testing); *see also Gutierrez v. State*, 307 S.W.3d

---

[3] Reed was not at her residence on December 2, 2002.

[4] On July 11, 2022, the State filed a motion, carried with this appeal, requesting that this Court take judicial notice of appellate record No. 13-03-527-CR. We now grant the State's motion. In resolving this appeal, we take judicial notice of the adjudicative facts in appellate record No. 13-03-527-CR, which is in this Court's possession. *See Routier v. State*, 273 S.W.3d 241, 244 n.2 (Tex. Crim. App. 2008) (taking judicial notice of the appellate record although "[t]he convicting court did not formally take judicial notice of the appellate record"); *see also Estrada v. State*, No. 13-13-00283-CR, 2015 WL 1869574, at *1 n.4 (Tex. App.—Corpus Christi–Edinburg Apr. 23, 2015, pet. ref'd) (mem. op., not designated for publication) ("We may also, in exercise of our discretion, take judicial notice of 'adjudicative facts' for the first time on appeal." (citing *Watkins v. State*, 245 S.W.3d 444, 455–56 (Tex. Crim. App. 2008))); *Birdwell v. State*, No. 10-09-00409-CR, 2011 WL 6956113, at *2 (Tex. App.—Waco Dec. 28, 2011, pet. ref'd) (mem. op., not designated for publication) (taking judicial notice of adjudicative facts on an appeal of a Chapter 64 motion and concluding "[a]ny error in the trial court's refusal to take judicial notice is harmless because, as we have held above, Birdwell is not entitled to DNA testing under article 64.03"). All other pending motions are denied as moot.

318, 321 (Tex. Crim. App. 2010) (discussing appellate procedure under Chapter 64). This appeal followed.

## II. CHAPTER 64

### A. Standard of Review and Applicable Law

"There is no free-standing due-process right to DNA testing . . . ." *Ramirez v. State*, 621 S.W.3d 711, 717 (Tex. Crim. App. 2021) (quoting *Ex parte Gutierrez*, 337 S.W.3d 883, 889 (Tex. Crim. App. 2011)). Post-conviction forensic DNA testing is authorized only if certain statutory requirements are met under Chapter 64. *See* TEX. CODE CRIM. PROC. ANN. arts. 64.01, 64.03. The convicted person bears the burden of satisfying all Chapter 64 requirements. *Hall v. State*, 569 S.W.3d 646, 655 (Tex. Crim. App. 2019).

Pursuant to Chapter 64, the convicted person must show that: (1) the evidence "still exists and is in a condition making DNA testing possible"; (2) the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect"; (3) "there is a reasonable likelihood that the evidence contains biological material suitable for DNA testing"; and (4) "identity was or is an issue in the case[.]" TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(1). A convicted person standing guilty pursuant to a guilty plea may submit a Chapter 64 motion, "and the convicting court is prohibited from finding that identity was not an issue in the case *solely* on the basis of that plea, confession, or admission." *Id.* art. 64.03(b) (emphasis added). However, a recorded guilty plea is "typically strong evidence supporting a non-favorable finding." *Dunning v. State*, 572 S.W.3d 685, 694 (Tex. Crim. App. 2019). "Convicting courts should give great respect to knowing, voluntary, and

7

intelligent pleas of guilty." *Id.* (quoting *Ex parte Tuley*, 109 S.W.3d 388, 391 (Tex. Crim. App. 2002)) (cleaned up).

Additionally, under Chapter 64, the convicted person must establish by a preponderance of the evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing" and that "the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice." TEX. CODE CRIM. PROC. ANN. art. 64.03(a)(2). "This means that a convicted person must show a greater than [fifty percent] chance that he would not have been convicted if exculpatory results from the requested DNA testing had been available at trial." *Hall*, 569 S.W.3d at 655.

Generally, we give great deference to the trial court where application-of-law-to-fact issues turn on witness credibility and demeanor, and we consider de novo all other application-of-law-to-fact questions. *Ramirez*, 621 S.W.3d at 718. Because here the trial court held no hearing on appellant's motion and a cold record is all which informs appellant's motion, "the trial court is in no better position and we will review the issues *de novo.*" *See Smith v. State*, 165 S.W.3d 361, 363 (Tex. Crim. App. 2005); *see also Resendez v. State*, No. 13-19-00278-CR, 2021 WL 376902, at *2 (Tex. App.—Corpus Christi–Edinburg Feb. 4, 2021, pet. ref'd) (mem. op., not designated for publication) ("[W]e review de novo other application-of-law-to-fact issues, such as the ultimate issue in post-conviction DNA testing cases: 'whether a reasonable probability exists that exculpatory DNA tests would prove innocence.'" (quoting *Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002))); *Webb v. State*, No. 10-18-00170-CR, 2021 WL 4900926, at *3 (Tex.

8

App.—Waco Oct. 20, 2021, no pet.) (mem. op., not designated for publication) ("In the instant case, the trial court did not conduct a live hearing. Therefore, we review the trial court's denial of DNA testing de novo.").

## B.    Analysis

By appellant's first issue, he contends that the trial court erred in denying his motion because identity is an issue in this case, and he has shown by a preponderance of the evidence that he would not have been convicted had exculpatory results been obtained through DNA testing. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03(a).

In appellant's Chapter 64 motion, appellant requested the testing of a "handgun, clip inside [the] handgun, and bullets" used in the robbery. Appellant asserted that the handgun, clip, and bullets are "in [p]ossession of the State"[5] but made no comment regarding whether the evidence was in a condition making testing possible or whether the evidence "has been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect." *See id.* art. 64.03(a)(1)(A)(i), (ii). Appellant averred identity was an issue in this case and identification from the "mitochondrial [DNA] fingerprints pulled from the weapon (gun) clips and bullets, will identify the actual suspect to the alleged aggravated robbery." *See id.* art. 64.03(a)(1)(C), (a)(2)(A). Appellant's affidavit, pursuant to Article 64.01(a-1), accompanied his motion. *See id.* art. 64.01(a-1) ("The motion [for Chapter 64 DNA testing] must be accompanied by an affidavit, sworn to by the convicted person, containing

---

[5] Apart from appellant's statement, the record contains no evidence that bullets were either used in the robbery or recovered by law enforcement. *See* TEX. CODE CRIM. PROC. ANN. art. 64.01(b).

statements of fact in support of the motion."). Even assuming appellant *addressed* all requisite Chapter 64 requirements in his motion and affidavit, appellant failed to carry his burden to establish his entitlement to DNA testing. *See id.* arts. 64.01, 64.03.

First, appellant's "confession is properly considered in determining whether he has met his burden under Article 64.03(a)(2)." *See Ramirez*, 621 S.W.3d at 722. Appellant does not allege, and there is nothing in the record to indicate, that appellant's written confession to law enforcement or subsequent guilty plea was made in a manner other than knowingly, voluntarily, and intelligently. *See id.*; *Dunning*, 572 S.W.3d at 695 ("[I]f there is no reason to believe that a defendant's plea was inaccurate or unreliable, that plea should be given great weight."). Additionally, appellant does not contest the veracity of the letter exhibit, written by him and addressed to one of the complainants, wherein he apologizes for his involvement in the robbery. The record also contains written statements from both of appellant's accomplices linking him to the robbery. *See Ex parte Gutierrez*, 337 S.W.3d at 892 ("[B]ecause a person's effort to secure testing under Chapter 64 does not involve any constitutional considerations, the trial judge could properly consider the accomplices' statements."). "Texas courts have consistently held that a movant does not satisfy his burden under Article 64.03 if the record contains other substantial evidence of guilt independent of that for which the movant seeks DNA testing." *Swearingen v. State*, 303 S.W.3d 728, 736 (Tex. Crim. App. 2010).

Moreover, the probative value of any exculpatory DNA result from testing the weapon (or clip) is diminished by the conditions under which the weapon was found by law enforcement. *See Hall*, 569 S.W.3d at 658. The weapon was not recovered at or near

10

the location of the robbery shortly after the robbery or at appellant's residence; instead, it was retrieved one week later at appellant's co-defendant's father's "shop," and it is unclear how many individuals may have handled the weapon succeeding the robbery. The probative value of DNA testing in this circumstance is, therefore, limited:

> DNA analysis is not as probative when the items tested are not at a place where only a reasonably limited number of DNA contributors would be found. Touch DNA poses special problems because epithelial cells are ubiquitous on handled materials, because there is an uncertain connection between the DNA profile identified from the epithelial cells and the person who deposited them, and because touch DNA analysis cannot determine when an epithelial cell was deposited.

*Hall*, 569 S.W.3d at 658 (quoting *Reed v. State*, 541 S.W.3d 759, 777 (Tex. Crim. App. 2017)) (cleaned up); *see generally Pegues v. State*, 518 S.W.3d 529, 535 (Tex. App.— Houston [1st Dist.] 2017, no pet.) (observing situations wherein DNA testing cannot be used to exculpate the convicted person, including where "a defendant is convicted under party liability for a crime involving multiple criminal actors and biological material collected from the crime scene could have been from any of those criminal actors" and "when physical evidence was collected from a common area and could have been left by any of a number of people, meaning that DNA test results excluding the movant as the source would not also exclude the movant as the assailant").

Regarding the bullets, there is no evidence before us that bullets were ever collected by law enforcement; bullets were not admitted into evidence at trial. *See* TEX. CODE CRIM. PROC. ANN. art. 64.01(b) (providing that Chapter 64 motions may only concern the testing of evidence "that was secured in relation to the offense that is the basis of the challenged conviction and was in the possession of the state during the trial of the

offense"). Even if bullets were used and retrieved as appellant speculates, we are without any indication that they still exist, that they "contain biological material suitable for DNA testing," or that they have "not been substituted, tampered with, replaced, or altered in any material respect." *See id.* art. 64.03(a)(1); *Swearingen*, 303 S.W.3d at 732 ("[A] mere assertion or a general claim that existence of biological material is probable will fail to satisfy the appellant's burden.").

"The bottom line in post-conviction DNA testing is this: Will this testing, if it shows that the biological material does not belong to the defendant, establish, by a preponderance of the evidence, that he did not commit the crime as either a principal or a party?" *Ex parte Gutierrez*, 337 S.W.3d at 900. For the reasons explained above, we conclude that it would not. *See id.*; *see, e.g., Weems v. State*, 550 S.W.3d 776, 780–81 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (concluding appellant could not demonstrate that results from DNA testing would establish innocence where appellant confessed to the offense and "the object was in a location others came into contact with" and may have been handled by either of appellant's two co-defendants). Because appellant failed to satisfy several threshold requirements of Chapter 64, the trial court did not err in denying appellant's Chapter 64 motion. We overrule appellant's first issue.

### III.    COURT-APPOINTED COUNSEL

By his second issue, appellant asserts the trial court erred in denying his motion for court-appointed counsel.

Entitlement to court-appointed counsel in a Chapter 64 proceeding is conditioned on the trial court finding, in relevant part, that reasonable grounds exist for filing the motion

for post-conviction DNA testing. *Gutierrez*, 307 S.W.3d at 321; *see* TEX. CODE CRIM. PROC. ANN. art. 64.01(c). "[W]hether 'reasonable grounds' exist for testing necessarily turns on what is required for testing." *Ex parte Gutierrez*, 337 S.W.3d at 891 (observing that "[c]ourts have found that reasonable grounds for testing are not present if no biological evidence exists or if it has been destroyed, or if identity was not or is not an issue"). In other words, a convicted person's failure to establish the prescribed statutory requirements to obtain DNA testing in his Chapter 64 motion may frustrate his entitlement to appointment of counsel. *See id.* at 892.

We have already concluded that appellant did not meet his burden under Chapter 64. Because any "exculpatory" test result "would not change the probability that [he] would still have been convicted, then there [we]re no reasonable grounds to appoint an attorney," and the trial court did not abuse its discretion in denying appellant's request. *See id.* at 892; *see also Russell v. State*, No. 02-19-00416-CR, 2021 WL 2006401, at *5 (Tex. App.—Fort Worth May 20, 2021), *cert. denied*, 142 S. Ct. 2754 (2022) (mem. op., not designated for publication) ("Because [a]ppellant was not entitled to DNA testing under Article 64.03, the trial court did not reversibly err by denying him appointed counsel under Article 64.01(c)."); *Rivas v. State*, No. 13-16-00414-CR, 2017 WL 1228914, at *3 (Tex. App.—Corpus Christi–Edinburg Mar. 2, 2017, pet. ref'd) (mem. op., not designated for publication) (affirming the trial court's refusal to appoint counsel where appellant failed to establish Chapter 64 preconditions). Appellant's second issue challenging the trial court's denial of his motion for court-appointed counsel is overruled.

13

## IV. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
25th day of August, 2022.

14